1   KAMALA D. HARRIS
    Attorney General of California
2   PEGGY S. RUFFRA
    Supervising Deputy Attorney General
3   SHARON WOODEN
    Deputy Attorney General
4   State Bar No. 108709
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA  94102-7004
     Telephone:  (415) 703-5966
6    Fax:  (415) 703-1234
     E-mail:  Sharon.Wooden@doj.ca.gov
7   *Attorneys for Respondent*

8                 IN THE UNITED STATES DISTRICT COURT

9               FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

12   **DWIGHT R. CULTON,**                    C 14-05099 HRL (PR)

                              Petitioner,     **MEMORANDUM OF POINTS AND**
13                                            **AUTHORITIES IN SUPPORT OF**
                                              **ANSWER TO PETITION FOR HABEAS**
14        **v.**                              **CORPUS**

15   **ERIC ARNOLD, Warden,**

16                              Respondent.

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

**Page**

Statement of the Case ................................................................................................. 1

Statement of Facts .................................................................................................... 1

Standard of Review .................................................................................................. 3

Argument ................................................................................................................. 3

     I.     The trial court properly denied petitioner's *Batson/Wheeler* motion ..................... 3

     II.    The trial court did not err in admitting the autopsy report or the testimony by a pathologist who did not write the report ....................................... 11

     III.   No instructional error occurred ........................................................... 15

     IV.   Petitioner was not improperly cross-examined about his post-arrest silence ....... 19

     V.    The trial court properly excluded irrelevant evidence of the victim's state of mind ........................................................................................ 21

Conclusion ............................................................................................................. 25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*Aleman v. Uribe*
    723 F.3d 976 (9th Cir. 2013).................................................................................5

*Bains v. Cambra*
    204 F.3d 964 (9th Cir. 2000)...............................................................................17

*Batson v. Kentucky*
    476 U.S. 79 (1986) ...........................................................................................3, 5

*Brecht v. Abrahamson*
    507 U.S. 619 (1993) ................................................................................ *passim*

*Briggs v. Grounds*
    682 F.3d 1165 (9th Cir. 2012)...................................................................5, 10, 11

*Bullcoming v. New Mexico*
    (2011) 564 U.S. ___ ................................................................................12, 13, 14

*Calderon v. Coleman*
    525 U.S. 141 (1998)............................................................................................16

*Chambers v. Mississippi*
    410 U.S. 284 (1973)............................................................................................22

*Chapman v. California*
    386 U.S. 18 (1967) .......................................................................................12, 19

*Christian v. Frank*
    595 F.3d 1076 (2010)..........................................................................................24

*Cook v. Lamarque*
    593 F.3d 810 (9th Cir. 2010)................................................................................5

*Crawford v. Washington*
    541 U.S. 36 (2004) .......................................................................12, 13, 14, 15

*Donnelly v. DeChristoforo*
    416 U.S. 637 (1974) ...........................................................................................18

*Doyle v. Ohio*
    426 U.S. 610 (1976) ...............................................................................19, 20, 21

*Estelle v. McGuire*
    502 U.S. 62 (1991) ...............................................................................15, 16, 18, 21

ii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Fare v. Michael C.*
442 U.S. 707 (1979) ..............................................................21

*Felkner v. Jackson*
131 S.Ct. 1305 (2011) ............................................................4

*Fetterly v. Paskett*
15 F.3d 1472 (9th Cir. 1994) ................................................18

*Gonzalez v. Brown*
585 F.3d 1202 (9th Cir. 2009) ..............................................11

*Harrington v. Richter*
131 S.Ct. 770 (2011) .........................................................3, 15

*Hensley v. Roden*
755 F.3d 724 (1st Cir. 2014) .............................................14, 15

*Hernandez v. New York*
500 U.S. 352 (1991) ...............................................................4

*Holmes v. South Carolina*
547 U.S. 319 (2006) .........................................................21, 23

*In re Littlefield*
5 Cal.4th 122 (1993) .............................................................16

*Jamerson v. Runnels*
713 F.3d 1218 (9th Cir. 2013) ................................................5

*McNeiece v. Lattimore*
501 Fed.Appx. 634 (9th Cir. 2012) .......................................15

*Melendez-Diaz v. Massachusetts*
(2009) 557 U.S. 305 ...................................................12, 13, 14

*Middleton v. McNeil*
541 U.S. 433 (2004) ..........................................................16, 18

*Miller-El v. Cockrell*
537 U.S. 322 (2003) ...............................................................4

*Miranda v. Arizona*
384 U.S. 436 (1966) ...................................................19, 20, 21

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Mitleider v. Hall*
  391 F.3d 1039 (9th Cir. 2004)............................................................................5, 22

*Nevada v. Jackson*
  133 S.Ct. 1990 (2013) ...................................................................................23

*Ortiz v. Yates*
  704 F.3d 1026 (9th Cir. 2012).......................................................................17

*Palmer v. Estelle*
  985 F.2d 456 (9th Cir. 1993).........................................................................11

*People v. Adams*
  115 Cal.App.4th 243 (2004)......................................................................22, 23

*People v. Bonilla*
  41 Cal.4th 313 (2007) ......................................................................................8

*People v. Bradford*
  15 Cal.4th 1229 (1997) ..................................................................................22

*People v. Burgener*
  29 Cal.4th 833 (2003) ..................................................................................8, 9

*People v. Cabral*
  121 Cal.App.4th 748 (2004)...........................................................................17

*People v. Cunningham*
  25 Cal.4th 926 (2001) ....................................................................................19

*People v. Dungo*
  55 Cal.4th 608 (2012) ...............................................................12, 13, 14, 15

*People v. Elliott*
  53 Cal.4th 535 (2012) ....................................................................................23

*People v. Frierson*
  53 Cal.3d 730 (1991) .....................................................................................22

*People v. Gutierrez*
  28 Cal.4th 1083 (2002) ....................................................................................8

*People v. Hall*
  41 Cal.3d 826 (1986) ................................................................................22, 23

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

*People v. Hinton*
37 Cal.4th 839 (2006) ...........................................................................................20

*People v. Lawson*
131 Cal.App.4th 1242 (2005)...............................................................................17

*People v. Lenix*
44 Cal.4th 602 (2008) ...................................................................................7, 8, 9

*People v. Lewis*
43 Cal.4th 415 (2008) .............................................................................................8

*People v. Lomax*
49 Cal.4th 530 (2010) .............................................................................................8

*People v. McKinnon*
52 Cal.4th 610 (2011) ...........................................................................................23

*People v. Noguera*
4 Cal.4th 599 (1992) .............................................................................................22

*People v. Pearson*
56 Cal.4th 393 (2013) ...........................................................................................12

*People v. Ricardi*
54 Cal.4th 758 (2012) .....................................................................................22, 23

*People v. Riggs*
44 Cal.4th at 248(2008) ...................................................................................17, 18

*People v. Ruiz*
44 Cal.3d 589 (1988) ............................................................................................23

*People v. Stevens*
41 Cal.4th 182 (2007) .............................................................................................8

*People v. Waidla*
22 Cal.4th 690 (2000) ...........................................................................................22

*People v. Watson*
46 Cal.2d 818 (1956) ............................................................................................17

*People v. Wheeler*
22 Cal.3d 258 (1978) .........................................................................................3, 7

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*People v. Williams*
 40 Cal.4th 287 (2006) ...........................................................................................8

4

*Perry v. Rushen*
 713 F.2d 1447 (9th Cir. 1983)...............................................................................24

5

6

*Phillips v. Herndon*
 730 F.3d 773 (9th Cir. 2013)..................................................................................23

7

*Purkett v. Elem*
 514 U.S. 765 (1995)..................................................................................................4

8

9

*Rice v. Collins*
 546 U.S. 333 (2006)........................................................................................3, 4, 10

10

*Schriro v. Landrigan*
 550 U.S. 465 (2007) ..................................................................................................3

11

12

*Smith v. Spisak*
 558 U.S. 139 (2010)................................................................................................16

13

14

*Snyder v. Louisiana*
 552 U.S. 472 (2008)......................................................................................4, 5, 10

15

*Spivey v. Rocha*
 194 F.3d 971 (9th Cir. 1999)..................................................................................24

16

17

*Thaler v. Haynes*
 559 U.S. 43 (2010) .............................................................................................4, 10

18

19

*Turner v. Marshall*
 121 F.3d 1248 (9th Cir. 1997).................................................................................11

20

*United States v. Mallay*
 712 F.3d 79 (2d Cir. 2013)...............................................................................14, 15

21

22

*Waddington v. Sarausad*
 555 U.S. 179 (2009)................................................................................................16

23

24

*White v. Woodall*
 134 S.Ct. 1697 (2014)............................................................................................15

25

26

*Williams v. Illinois*
 (2012) 567 U.S. _ ......................................................................................12, 13, 14

27

28

vi

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Williams v. Taylor*
   529 U.S. 362 (2000) ................................................................3, 13, 14, 15

4

*Yarborough v. Alvarado*
   541 U.S. 652 (2004) ................................................................24

5

6

**STATUTES**

7

United States Code, Title 28
   § 2254................................................................................3
   § 2254(c)(1)........................................................................11
   § 2254(d) ...........................................................................15
   § 2254(d)(1) .........................................................................3
   § 2254(d)(2) .............................................................3, 4, 5, 11
   § 2254(e)(1)..........................................................................5

8

9

10

11

12

**CONSTITUTIONAL PROVISIONS**

13

United States Constitution
   Fifth Amendment ................................................19, 20, 21
   Sixth Amendment ........................................................12

14

15

**OTHER AUTHORITIES**

16

CALCRIM, Judicial Council of California, Criminal Jury Instructions
   No. 306................................................................16, 17

17

18

California Jury Instructions, Criminal
   No. 2.28................................................................17

19

20

21

22

23

24

25

26

27

28

**STATEMENT OF THE CASE**

Petitioner was sentenced to serve 25 years to life in state prison after a jury found him guilty of first degree murder.  Exh. 1 at 117, 1485, 1602.

Petitioner appealed to the California Court of Appeal.  On June 27, 2013, the Court of Appeal affirmed the judgment.  Exh. 3.  Petitioner's Petition for Review was denied on October 2, 2013.  Petitioner filed the instant Petition for Writ of Habeas Corpus on November 19, 2014.

**STATEMENT OF FACTS**

The facts of the case were summarized by the California Court of Appeal as follows:

In 1984, [Joan] Baldwin worked at an Earl Scheib auto painting shop on Bryant Street in San Francisco.  The manager, Ara Derboghossian, allowed her to stay overnight in the shop in an upstairs room when she was having problems at home, but he did not give her the keys because to do so would put his job at risk.  When the doors to the shop were locked at night, there was no way for Baldwin to get out of the building.

On the evening of April 5, 1984, Baldwin returned to the shop from happy hour at about 6:00 p.m.  She followed Derboghossian as he locked the front and back sliding doors to the shop from the inside and then left the building through the side door, locking it behind him.  Earl Scheib employee Mario Leyva arrived for work at about 7:30 the following morning, April 6, 1984, and noticed the shop's front sliding doors—usually closed and padlocked—were unlocked and wide open.  He went inside and saw Baldwin's dead and partially unclothed body lying on the floor of the shop's office.  Derboghossian arrived for work and summoned the police.

The officers who responded found the following crime scene:  Baldwin's body was lying in a pool of blood and had visible wounds on the face, chest, thigh, and right arm.  A cutting of skin and hair from the pubic area (later determined to have been made after her death) was on the floor about two feet from her head, and a bloody fingerprint was visible on her right inner thigh.  The walls and furniture of the office were bloody, the office floor safe was open, and the cord of the office telephone had been cut.  The window on the office door was broken, and broken glass fragments were on the floor.  There was blood on the floor outside the office and a footprint was visible on the concrete.  A 1969 Buick was missing from the shop and was recovered a few days later on Valencia Street in San Francisco, with a blood stain on the front seat and a bloody tissue inside.  A criminalist collected blood samples from the shop and the Buick and preserved them in the crime lab freezer.

Dr. Jose Ferrer performed an autopsy of Baldwin's body and concluded the cause of death was a stab wound to Baldwin's chest penetrating her heart, consistent with a knife wound.  Baldwin had cuts on her face and right forearm (the latter possibly a defensive wound), which could have been caused by a knife or a piece of broken glass.  There were abrasions on Baldwin's right and left elbows, left eye, right knee and lower back, and a section of skin and hair in her pubic area had been excised by a post-mortem cutting.  Holes in Baldwin's blouse (recovered from the scene) were consistent with the wounds to her chest and arm.  There was no evidence of trauma to or semen in her vagina.

1

Blood samples from the case were submitted to the San Francisco crime lab for DNA analysis in 2006.  Appellant's DNA matched a blood stain on Baldwin's thigh, blood stains found on the floor and on broken glass found outside the shop office, a blood stain in the middle of the garage area of the shop, and bloodstains found inside the 1969 Buick that was stolen from the shop and later recovered.  The possibility a random unrelated person would possess the same DNA profile as the blood on Baldwin's left thigh was one in 5.7 quadrillion American Caucasians or African Americans, one in 61 quadrillion California Hispanics, and one in two quadrillion general population Asians.

The fingerprint on Baldwin's thigh had been submitted to the Automated Fingerprint Identification System in 1984 and received candidates other than appellant for possible matches, but none of those candidates actually matched the print.  In 2006, the print from Baldwin's thigh was examined by a fingerprint expert with the San Francisco Police Department who was "completely certain" it was appellant's left thumb print.

On November 8, 2006, Inspectors Pera and Toomey of the San Francisco Police Department met with appellant regarding Baldwin's murder.  They told appellant he was not under arrest and was free to leave at any time.  Appellant acknowledged working as a painter at the Earl Scheib shop on Bryant Street in the early 1980s, and as an assistant manager in 1981 and 1982.  He claimed no woman worked at Earl Scheib when he was there, and said he did not know Baldwin or recognize her photo.  Told by the inspectors that Baldwin had been murdered in the shop, appellant said he had never heard of the crime.  Asked why his DNA might have been found at the shop, appellant said he had fought with a co-worker there.  When asked why his DNA was found near Baldwin's body, appellant could not supply an explanation.  The inspectors returned several days later with a search warrant to obtain oral swabs from appellant for DNA testing.  Appellant protested, but cooperated in giving the sample.

Appellant testified at trial and gave the following explanation of the circumstances linking him to Baldwin's murder:  He had been working as an auto body painter at the Earl Scheib shop in San Francisco and eventually became the manager of their shop in Vallejo.  On the evening of Baldwin's murder, he was "hustling" on Bryant Street, or "looking for a way to make a buck."  Sometime between 7:45 and 8:15 p.m., he noticed the doors of the Earl Scheib shop were open and assumed someone was in there painting cars "off the books" and pocketing the money.  Though he no longer worked at that shop, appellant went inside thinking he might be able to make some money.  He turned to go into the office when he didn't see anyone in the shop area.

Appellant claimed that as he entered the office, he almost stepped on Baldwin's body and jumped back.  He hit the office door with his hand, breaking the glass.  He bent down to look at Baldwin and shook her to see if she would respond, but she did not.  He walked out of the office "totally confused" with a "thousand thoughts" running through his head, and at some point noticed he was bleeding.  Appellant then drove a car away from the shop and left it in a tow-away zone on Valencia Street, near the home of a relative with whom he could talk.  His prior convictions included forgery, unarmed bank robbery, five to seven car thefts, and assault with force likely to cause great bodily injury.

The defense presented the testimony of Brent Turvey, who the court determined had "the very minimal qualifications" as an expert in crime scene reconstruction.[1]  After

---

[1] Turvey is an author of books on criminal investigation and profiling.  He is not a doctor,

(continued…)

2

reviewing various materials given to him by the defense, Turvey concluded the chain on the front door to the shop had been broken from the inside.  Based on this, he opined Baldwin either opened the door herself or the killer was already inside the shop when the doors were locked.  Turvey believed the crime scene was staged to make it look like someone had broken in and attacked Baldwin.

Exh. 3 at 2-5.

## STANDARD OF REVIEW

This case is governed by 28 U.S.C. § 2254 as revised by the AEDPA, which provides that the federal court cannot grant habeas relief unless the state court's ruling "was contrary to, or involved an unreasonable application of," clearly established United States Supreme Court law, 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2).  *Williams v. Taylor*, 529 U.S. 362, 411-413 (2000).

"The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement."  *Harrington v. Richter*, 131 S.Ct. 770, 786-87 (2011).  "If this standard is difficult to meet, that is because it was meant to be."  *Id*. at 786.

## ARGUMENT

**I.     THE TRIAL COURT PROPERLY DENIED PETITIONER'S *BATSON/WHEELER* MOTION**

Petitioner contends the trial court erred in denying his *Batson/Wheeler* claim.[2]  Petn., Attachment at 1-4.

In *Rice v. Collins*, 546 U.S. 333 (2006), the Supreme Court summarized the *Batson* standard as follows:

_____

(…continued)
nurse, psychologist, medical examiner, criminalist, or crime scene technician, and his application for membership in the Academy of Forensic Sciences was rejected.  Although he claimed to be a sworn peace officer in Alaska, he has never attended a police academy.
     [2] *People v. Wheeler* (1978) 22 Cal.3d 258 and *Batson v. Kentucky* (1986) 476 U.S. 79.

3

1

2

3

4

5

6

7

A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question.  Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible;" so long as the reason is not inherently discriminatory, it suffices.  Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.  This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."

*Id*. at 338 (citations omitted).

8

9

10

11

12

13

14

15

The *Collins* court upheld the state court's conclusion that the prosecutor's reasons for striking the prospective jurors were race-neutral, because "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."  *Rice v. Collins*, 546 U.S. at 341-342; *accord Felkner v. Jackson*, 131 S.Ct. 1305, 1307 (2011) (per curiam) (reversing Ninth Circuit's grant of the writ where trial court credited prosecutor's race-neutral explanations and appellate court carefully reviewed the record in upholding the trial court's findings, which "plainly was not unreasonable").

16

17

18

19

20

21

22

23

24

25

26

27

28

The state court's conclusion that the prosecutor's asserted reasons for a peremptory challenge were valid is entitled to particular deference.  The Supreme Court has declined to address whether AEDPA review of a third-stage Batson claim falls under 28 U.S.C. § 2254(d)(2) or (e)(1) or both.  *Rice v. Collins*, 546 U.S. at 338-39; *see Thaler v. Haynes*, 559 U.S. 43, 49 (2010) (per curiam) (noting that court should review question under "the federal habeas statute's standard for reviewing a state court's resolution of questions of fact").  However, the Supreme Court treated the issue as a presumptively correct factual finding in two pre-AEDPA cases, *Purkett v. Elem*, 514 U.S. 765, 769 (1995) (per curiam), and *Hernandez v. New York*, 500 U.S. 352, 366 (1991), and has consistently described the trial court's determination as a credibility finding.  *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008); *Miller-El v. Cockrell*, 537 U.S. 322, 338-339 (2003).  At the very least, the Supreme Court has emphasized that reviewing courts must give "great deference" to the trial court's finding that the prosecutor's reasons for exercising

4

1  peremptory challenges were genuine.  *Batson*, 476 U.S. at 98 n. 21; *Snyder*, 552 U.S. at 477

2  ("these determinations of credibility and demeanor lie peculiarly within a trial judge's province,

3  and we have stated that in the absence of exceptional circumstances, we would defer to the trial

4  court").

5      Some Ninth Circuit cases have held that federal habeas review of this question falls under

6  28 U.S.C. § 2254(e)(1), thus the state court's factual findings are presumed correct absent clear

7  and convincing evidence to the contrary.  *Mitleider v. Hall*, 391 F.3d 1039, 1050 (9th Cir. 2004).

8  Other Ninth Circuit cases have held that 28 U.S.C. § 2254(d)(2) applies.  *Jamerson v. Runnels*,

9  713 F.3d 1218, 1224-1225 & n. 1 (9th Cir. 2013); *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th

10  Cir. 2012); *Cook v. Lamarque*, 593 F.3d 810, 816 (9th Cir. 2010).  At the very least, the Ninth

11  Circuit views this standard as "doubly deferential," because "unless the state appellate court was

12  objectively unreasonable in concluding that a trial court's credibility determination was supported

13  by substantial evidence, we must uphold it."  *Briggs*, 682 F.3d at 1170; *accord Aleman v. Uribe*,

14  723 F.3d 976, 983 (9th Cir. 2013); *Jamerson v. Runnels*, 713 F.3d at 1234.

15      In this case, the California Court of Appeal rejected petitioner's *Batson/Wheeler* claim.

16  Specifically, the court held:

17      I.  *Batson/Wheeler*

18      The prospective jurors who were questioned during voir dire included three African
19      Americans.  One was seated on the jury, one was excused for cause, and the third,
       No. 2810788, was excused by the prosecutor using a peremptory challenge.
20      Appellant argues the peremptory challenge to Juror No. 2810788 was racially
       motivated, and the trial court erred in denying a *Batson/Wheeler* motion brought by
21      his counsel.  We disagree.

22      A.  Relevant Proceedings

23      During voir dire, Juror No. 2810788 said he lived in the Presidio, was married with
       two daughters, had worked for Presidio Trust as a carpenter/glazer for the past 10
24      years, and had worked in the Presidio generally for 27 years.  Defense counsel asked
       him, "Being the father of young women, would it impact you to know that this is the
25      killing of a woman?"  The juror indicated it would not, and defense counsel
       continued, "It wouldn't bring to mind your daughters and the possibility that they
26      might be in this situation, at some point?"  Juror No. 2810788 responded, "I would
       like to think that I've shown them, to the best that I could, that it would be okay."
27      Asked whether he would have "any kind of an emotional response to the fact that the
       victim in this case is a woman," the juror stated, "I don't know the person."

28

5

Later in the proceedings, the following interchange occurred between the prosecution and Juror No. 2810788: "Q: Your turn.  Some of the things we were talking about earl[ier] this morning.  First of all, you or any family members that you know of have any type of distasteful or bad experience with police officers? [¶] A: Not that hadn't been worked out with the court system. [¶] Q: Tell me about that? [¶] A: As a teenager, I've had some altercations.  I was born and raised here in San Francisco, so I've lived pretty much everywhere in San Francisco, spent three years in [the] Tenderloin District. [¶] Q: Keep your voice up. [¶] A: Spent a few years in the Tenderloin District.  Seen a lot of things. [¶] Q: Uh-huh. [¶] A: But where it involved me, it worked out. [¶] Q: Okay.  Do you think – well, was this when you were a teenager or as a young adult? [¶] A: Young adult. [¶] Q: And have you had any dealings with the court system? [¶] A: As far as . . . no. [¶] Q: Any type of felony convictions?  Any type of arrests or felonies? [¶] A: No. [¶] Q: I'm sorry, I didn't hear you. [¶] A: No. [¶] Q: Okay.  And in terms of the way you were treated by the police – or did you have any interactions with the District Attorney's Office? [¶] A: I think at age 19, I had to come here. [¶]  Q: And if you – stop you there.  If you don't feel comfortable talking about this in front of people, I mean, we can – it can be sensitive issues [sic].  We can go back in chambers and talk about it, too. [¶] A: Um, really – I don't think it concerns this case. [¶] Q: Okay. [¶] But, I don't have a problem with it. [¶] Q: Okay.  I'd kind of like to know about it? [¶] A: It was a – I had on my person a martial art weapon, and the officer took offense to that.  And we ended up going to court, and my lawyer didn't show up. [¶] And they held me in contempt, and that's when I had to deal with the District Attorney.  Like I said before, that it seem[ed] to have worked out. [¶] Q: Tell me what happened. [¶] A:  The court, the judge, ended up firing my lawyer, holding him in contempt.  They let me go on three years' probation for possession of a martial art weapons [sic] on my person, instead of . . . [¶] Q: And that was how long ago? [¶] A: I was 19.  So over 20 years ago. [¶] Q: What type of martial arts weapon was it? [¶] A: Various martial art weapons. [¶] Q: More than one? [¶] A: Yes."

The prosecutor asked to approach the bench and the court, at his request, asked Juror No. 2810788 to clarify whether he had been put on felony or misdemeanor probation.  The juror said it was misdemeanor probation.  The prosecutor then resumed his questioning of Juror No. 2810788: "Q: [S]orry to have to ask you about that.  Other than that, did you feel this system treated you fairly? [¶] A: Oh, yeah. [¶] Q: Okay.  The fact that you're going to be hearing mainly from police officers here, the fact that you had kind of a bad experience when you were 19, are you going to project that onto — [¶] A: No."  The prosecutor then asked some additional questions about Juror No. 2810788's approach to evaluating the credibility of witnesses, his views on the burden of proof beyond a reasonable doubt, and circumstantial evidence.  He later used his sixth peremptory challenge to excuse Juror No. 2810788.

Defense counsel did not immediately object to the prosecutor's peremptory challenge of Juror No. 2810788, but brought a *Batson/Wheeler* motion during an off-the-record chambers conference held after the morning courtroom session at which the challenge was exercised.  Voir dire continued, and after the alternate jurors had been selected and sworn, the parties memorialized the chambers conference on the record.

Defense counsel complained the prosecutor had extensively questioned Juror No. 2810788 about his arrest for weapon possession when he was 19 years old, whereas he had not asked similar questions of or excused two Caucasian jurors who had been arrested for marijuana possession and some sort of civil disobedience.  Counsel asked the court to conduct a comparative analysis of these other two jurors and appellant, and suggested the differential treatment during questioning was based on appellant's race.

6

The prosecutor responded that Juror No. 2810788 had mentioned some encounters with the police but said they were not relevant, and he was concerned the weapons charge the juror described might have been a felony (which could mean the juror was ineligible for jury service and had lied to the Jury Commissioner). The prosecutor asked the court to ask the juror whether the conviction was a misdemeanor or a felony because he did not want to alienate the juror in the event he decided to leave him on the panel. As to the other two jurors with a history of police contacts, the prosecutor explained, "Juror number five said that, at one point in time, he got arrested for being in a car, and there was marijuana in the car. And, I mean, a far cry different from having marijuana in a car, in terms of being armed with weapons. [¶] . . . . then with regards to the last juror, she frankly admitted, and freely admitted, what had happened in terms of her being arrested by the police officers. [¶] Entirely different than being arrested with some type of weapons where she said that she was engaged in civil disobedience on two different occasions."

The trial court indicated it did not believe the *Batson/Wheeler* motion was timely, as it was made after Juror No. 2810788 had been excused and had left the courtroom. It continued, "[E]ven assuming, for purposes of argument that [the motion] was timely, the fact of his – the fact that the conviction had been for a weapons-related charge, multiple weapons, in a case where there's an allegation of murder that was a murder with a weapon, and the fact that the conviction could have been a felony I think warranted the further examination that the District Attorney did of [Juror No. 2810788] in trying to clarify what these issues were. [¶] And so in comparison related to the other jurors, the fact of the political demonstration of disturbing the peace-related issues . . . or the marijuana-related issues. . . I can see that those present different kinds of issues. [¶] So in any comparative analysis, I don't see that there was any problem with the District Attorney's focus on [Juror No. 2810788] going into that inquiry."

The court asked the prosecutor if he had any other comments on his reasons for excusing Juror No. 2810788, and the prosecutor responded, "Well, the other reason is something I think he said yesterday when [defense counsel] indicated that – asked him about the fact that he had two daughters . . . that there was a woman who was murdered in this case, that this was a crime of violence against women, and he was very quick to say, 'I don't know that woman. It doesn't have any effect on me.' [¶] I mean, that type of reaction, to me, is kind of a cold reaction. I would think that anybody that has two daughters would have some type of reaction to the fact that, 'Well, yeah, it does concern me, because I have two daughters.' [¶] Just [the] cold, impersonal nature of that answer also concerned me. [¶] You know, if he would have said, 'Well, yeah, I do have some concerns, but I can put it aside.' He didn't even say that. So that was another thing that really concerned me when I thought about it yesterday."

The court found no pattern of exclusion against African American jurors, concluded the challenge to Juror No. 2810788 was not based on his race, and found race neutral reasons for excusing him from jury service on this case. It denied the *Batson/Wheeler* motion as untimely and on its merits.

B. Analysis

As discussed in *Batson, supra*, 476 U.S. 79 and *Wheeler, supra*, 22 Cal.3d 258, both the state and federal Constitutions bar peremptory challenges that are based on a juror's race, ethnicity, or membership in a similar cognizable class. (*People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix*).) A defendant who suspects a juror has been challenged for a discriminatory reason must bring a motion under *Batson/Wheeler*, at

7

which point the trial court will analyze the claim using a familiar three-prong test. First, it must determine whether the defendant has made a prima facie showing the prosecutor exercised a peremptory challenge based on race, ethnicity or some other impermissible ground. Second, if the showing is made, the burden then shifts to the prosecutor to demonstrate the challenge was exercised for a neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination by evaluating the proffered reasons and determining whether they are legitimate or pretextual. (*Lenix*, at p. 612.)

Appellant suggests this is a "first prong" case, and argues the trial court erred in finding no prima facie case of discrimination. The People respond that the court's ruling was in fact based on the second and third prongs of the *Batson/Wheeler* analysis. We agree with the People because the court made no express finding regarding a prima facie case of discrimination and resolved the issue by referring to the prosecutor's stated reasons for the challenge and defense counsel's comparative analysis of other jurors with a history of arrests. (*People v. Lewis* (2008) 43 Cal.4th 415, 470-471 [by requesting prosecutor to state reasons for peremptory challenge, court implicitly found prima facie case; in any event, by offering reasons, the prosecutor rendered moot the question of whether a prima facie case existed]; *People v. Bonilla* (2007) 41 Cal.4th 313, 350 [use of comparative analysis not appropriate when determining whether defendant made first-prong, prima facie showing of discrimination].)

Having concluded this is a second- and third-prong case, we review the trial court's determination that the challenge was not discriminatory for substantial evidence, presuming the prosecutor used the peremptory challenge in a constitutional manner and "giv[ing] great deference to the trial court's ability to distinguish bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864 (*Burgener*).) A reason does not need to be well-founded so long as it is not discriminatory. (*Purkett v. Elem* (1995) 514 U.S. 765, 768.) " ' [E]valuation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province." ' " (*People v. Stevens* (2007) 41 Cal.4th 182, 198.)

Substantial evidence supports the trial court's denial of the *Batson/Wheeler* motion. The prosecutor explained that he excused Juror No. 2810788 due to concerns about his weapons conviction. A prospective juror's arrest or criminal history or negative experience with law enforcement can serve as a valid basis for a peremptory challenge. (*People v. Lomax* (2010) 49 Cal.4th 530, 573; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1125.)

A comparative analysis of the responses of two seated Caucasian jurors with prior arrests does not alter our conclusion. The first, Juror No. 2945120, was asked about contacts with police officers and explained, "Well, I was arrested when I was 18 for being in a car where they found a small amount of marijuana. So, distasteful experience. Nothing the officer did wrong. I don't think the officer did anything wrong. He was just doing his job." The juror assured the parties nothing about the experience would prevent him from being fair and impartial. Marijuana possession is a nonviolent offense and the prosecutor could reasonably conclude it was not the equivalent of a prior arrest for illegal weapons, especially in a murder case where a weapon, but no drugs, were involved. (*See People v. Williams* (2006) 40 Cal.4th 287, 311-312 [the marijuana-related arrest of a seated juror's son was not comparable to the extensive criminal history of excused juror's family, which included a rape prosecution resulting in acquittal].)

8

The second seated juror with a history of police contacts, No. 2665378, had been arrested during a civil disobedience demonstration regarding housing about 10 years earlier and had found the San Francisco police officers she dealt with to be "very courteous and very patient." In 1967, the juror had been convicted of disturbing the peace due to her participation in a protest at the Oakland Induction Center, which consisted of singing Christmas carols. She spent 20 days in jail and described most of the jail guards as "jaded," but found one to be very kind. Finally, Juror No. 2665378 indicated the only bad experience she had ever had with a San Francisco police officer was when the head of the San Francisco Police Officers Association wrote a letter accusing the San Francisco Labor Council (to which she belonged) of being a terrorist organization, an accusation she attributed to political hyperbole. This juror's contacts with law enforcement were a product of her nonviolent political activism, a far different thing than a conviction for possessing multiple illegal weapons.

Appellant suggests a discriminatory intent can be gleaned from the prosecutor's "belated" reliance on appellant's "cold" response ("I don't know the person") when asked whether, as the father of two daughters, he would be affected by the fact the victim in this case was a woman. Appellant suggests this justification was pretextual and notes a seated juror, No. 29255598, simply answered "no" when asked whether he would be concerned about the personal safety of his wife and daughter considering the charged crime involved violence against a woman.

Comparative juror analysis based on the appellate record has inherent limitations. "On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact. 'Even an inflection in the voice can make a difference in the meaning.' " (*Lenix*, *supra*, 44 Cal.4th at p. 622.) While we do not have the benefit of being able to compare the demeanors of Juror No. 2810788 and the seated juror who commented that he would not be afraid for his wife and daughters, even the bare record suggests a difference in tone. The seated juror simply stated he would not fear for his family's personal safety; the excused juror said he would not have any kind of an emotional response to the case, because he did not know the victim. The first response indicates a lack of fear of appellant, the second suggests emotional indifference to the victim's circumstances.

Because the trial court's denial of the *Batson/Wheeler* motion on its merits is supported by substantial evidence, appellant is not entitled to reversal of the judgment on this ground. (*Burgener*, *supra*, 29 Cal.4th at p. 864.)

Exh. 3 at 5-12.

Petitioner contends the trial court erred in denying his *Batson/Wheeler* claim, as to the prosecutor's challenge of a single African-American prospective juror. Petn., Attachment at 1-4.

Contrary to petitioner's claim, there was not a pattern of exclusion of African-American individuals from the jury, and specifically there was no race-based exclusion of Prospective Juror No. 2810788. Instead, there were race neutral reasons for which the prospective juror could be excused from service in the case. Also, the additional questions for Prospective Juror No.

9

1    2810788 were warranted because he had a possible felony conviction for a "weapons-related-

2    charge" in a case where the charge was murder with a weapon.  Exh. 2A at 355.[3]

3          The prosecutor first asserted that he excused Juror No. 2810788 because of his conviction

4    for possession of weapons.  The state court reasonably concluded that this was valid reason to

5    challenge a juror in a murder case involving weapons.  The prosecutor next asserted that he

6    excused the juror because of his "cold" response to the question about whether he would be

7    affected by the facts of this case because he had two daughters.  The Supreme Court has

8    acknowledged that race-neutral reasons for peremptory challenges "often invoke a juror's

9    demeanor."  *Snyder v. Louisiana*, 552 U.S. at 477; *see Thaler v. Haynes*, 559 U.S. at 44-45

10   (juror's demeanor and body language showed she failed to take capital case seriously); *Rice v.*

11   *Collins*, 546 U.S. at 336 (juror rolled her eyes in response to question from court); *Briggs v.*

12   *Grounds*, 682 F.3d at 1178 (juror's demeanor and flippant responses showed he did not take

13   process seriously).  The state court reasonably concluded this was also a valid reason.

14         Further, the state court reasonably determined that a comparison of Juror No. 2810788 to

15   other jurors who were not challenged failed to demonstrate that the challenge was pretextual.

16   "Where the state court conducted comparative analysis and determined that the prosecutor did not

17   exercise her peremptory challenges in a discriminatory manner, AEDPA deference applies and

18   we need not undertake comparative analysis de novo."  *Briggs v. Grounds*, 682 F.3d at 1171 n.6.

19         As the California Court of Appeal found, petitioner's attempt to compare the prosecutor's

20   interaction with Prospective Juror No. 2810788 and his interaction with other jurors is misplaced.

21   For example, Prospective Juror No. 2945120 quickly summarized her legal history and the

22   prosecutor had no need for further inquiries.  Also, Prospective Juror No. 2945120 was not

23   prosecuted for possession of weapons.  Instead, she was arrested for being a car where a small

24   amount of marijuana was found.  Exh. 2A at 82-83.  Similarly, Prospective Juror No. 2665378

25   had previous arrests for civil disobedience and disturbing the peace.  She was a union and

26   political activist, and had many experiences with law enforcement over the years.  She readily

27

28
_____
      [3] Exhibit 2A refers to the Augmented reporter's transcript.

1    described those experiences without the need for a lot of questions from the prosecutor.  Exh. 2A

2    at 323-327.

3          Prospective Juror No. 2810788, on the other hand, told defense counsel that he did not have

4    any negative experiences with the police.  He then told the prosecutor that he did have such an

5    experience, but it was resolved in the courts.  When asked about the experience, the Juror vaguely

6    described "some altercations."  When asked again for details, the Juror stated it was not relevant

7    to the case.  In other words, Prospective Juror No. 2810788 did not "quickly summarize" or

8    "readily describe" his legal history.  Instead, the prosecutor had to ferret out each and every detail

9    with a question until he finally had a complete picture of the juror's experience with law

10   enforcement and the criminal justice system.

11         Further, the prosecutor left one African-American juror on the jury, which supported the

12   trial court's finding.  Exh. 2A at 353; *Gonzalez v. Brown*, 585 F.3d 1202, 1210 (9th Cir. 2009)

13   (the fact that black jurors remained on the panel was indicative of non-racial motive for

14   challenges); *Turner v. Marshall*, 121 F.3d 1248, 1254 (9th Cir. 1997) (while not dispositive, "the

15   fact that the prosecutor accepted four African-Americans on the jury may be considered

16   indicative of a nondiscriminatory motive"); *Palmer v. Estelle*, 985 F.2d 456, 458 (9th Cir. 1993)

17   (same).

18         In sum, the prosecutor had valid race-neutral reasons for excusing prospective Juror No.

19   2810788.  The trial court accepted those reasons, and that factual finding was not unreasonable

20   under either § 2254(d)(2) or § 2254(c)(1).  The California Court of Appeal's determination on

21   review is likewise entitled to appropriate deference.  *Briggs v. Grounds*, 682 F.3d at 1171).  Since

22   there was no purposeful discrimination during jury selection in this case, the state court's

23   determination was neither contrary to, nor an unreasonable application of established Supreme

24   Court precedent.  Petitioner's claim fails.

25   **II.    THE TRIAL COURT DID NOT ERR IN ADMITTING THE AUTOPSY REPORT OR THE
             TESTIMONY BY A PATHOLOGIST WHO DID NOT WRITE THE REPORT**

26

27

28

11

1    Petitioner contends that his Sixth Amendment right was violated when the trial court

2 allowed the medical examiner to testify regarding the result of the autopsy that was conducted in

3 1984 and admitted the autopsy report as a business record.  Petn., Attachment at 4-6.

4    The California Court of Appeal rejected petitioner's claim.  Specifically, the court held:

5 II.  Autopsy Report

6 Appellant argues he was deprived of his constitutional right to confrontation (U.S.
 Const., 6th Amend.) because the court admitted evidence of an autopsy report
7 prepared by a pathologist who did not testify at trial, and allowed a medical examiner
 called as a prosecution witness to offer opinions based on that report.  We disagree.
8
9 In *Crawford v. Washington* (2004) 541 U.S. 36, 59 (*Crawford*), the United States
 Supreme Court held a defendant's federal constitutional right to confrontation
10 prohibits the use of "testimonial statements" of a witness who does not appear at trial
 unless the witness is unavailable to testify and the defendant had a prior opportunity
11 for cross-examination.  Though the court did not—and has not—supplied a bright-
 line rule for what makes a statement testimonial, such statements "have two critical
12 components.  First, to be testimonial the statement must be made with some degree of
 formality or solemnity.  Second, the statement is testimonial only if its primary
13 purpose pertains in some fashion to a criminal prosecution."  (*People v. Dungo*
 (2012) 55 Cal.4th 608, 619 (*Dungo*).)  The United States Supreme Court has since
14 considered the meaning of "testimonial" as it relates to official reports offered as
 evidence when the person who prepared the report does not testify at trial.  (*See
15 Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 311 [laboratory's sworn
 "certificates of analysis" stating that a substance was cocaine was testimonial];
16 *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705] [certified laboratory
 report regarding alcohol content of blood sample was testimonial]; *Williams v. Illinois*
17 (2012) 567 U.S. _ [132 S.Ct. 2221]) [plurality of the court concluded an expert's
 testimony regarding a DNA profile by laboratory analyst who did not testify at trial
18 did not violate Confrontation Clause].)

19 The medical examiner who prepared the autopsy report in this case, Dr. Ferrer, had
 died by the time of appellant's trial in 2011.  Over defense objection, the court
20 allowed prosecution witness and chief medical examiner Dr. Amy Hart to relate the
 factual findings of the report and to rely on those findings in support of her own
21 opinion regarding the cause and time of Baldwin's death.  The court also admitted the
 report into evidence, finding it to be admissible as a business or official record.
22 (Evid. Code, §§ 1271, 1280.)

23 It is not necessary in this case to delve into the intricacies of the Confrontation
 Clause.  Apart from the autopsy report, the evidence was overwhelming that Baldwin
24 was attacked, stabbed, and bled to death.  The extent of her injuries and cause of her
 death are not in dispute, and any error relating to that aspect of the evidence would be
25 harmless beyond a reasonable doubt.  (*People v. Pearson* (2013) 56 Cal.4th 393, 463-
 464; *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)  Appellant's claim
26 of prejudicial error is limited to a fairly narrow aspect of Dr. Hart's testimony—her
 opinion regarding the time of death.

27 Based on the liver temperature recorded by Dr. Ferrer in the autopsy report, Dr. Hart
 estimated the actual time of Baldwin's death as between 7 and 22 hours before the
28 liver temperature was taken.  She indicated that lividity (coloration of the body based

12

1
2
3
4
5

on the settling of the blood) could sometimes assist in timing a death, but she did not in this case know the conditions or temperature of the area where Baldwin's body was found.  Asked by the prosecutor to assume the body was in a cold warehouse on a concrete floor all night, Dr. Hart testified the death could have occurred between 10:00 p.m. and 2:00 a.m., though she acknowledged this range was just an estimate. The 10:00 p.m. to 2:00 a.m. window conflicts with appellant's own testimony that he entered the Earl Scheib shop and found Baldwin already dead between 7:45 p.m. and 8:15 p.m.

6
7
8
9

Dr. Hart's testimony regarding the time of death was based on the liver temperature recorded in the autopsy report and photographs showing the body's postmortem lividity.  In *Dungo*, *supra*, 55 Cal.4th at page 619, the California Supreme Court concluded a pathologist's observations in an autopsy report regarding the condition of a victim's body are not testimonial within the meaning of *Crawford*.  Because the only aspect of the report on which the allegedly prejudicial testimony by Dr. Hart was based is not testimonial, her opinion on this point did not violate the Confrontation Clause.

10   Exh. 3 at 12-14.

11      In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, a 5-4 decision, the Supreme Court held

12   that a sworn certificate from a crime lab analyst identifying a controlled substance qualified as

13   testimonial evidence, because it was created for the purpose of establishing or proving some fact

14   at trial, and was functionally identical to in-court testimony.  In *Bullcoming v. New Mexico*, 131

15   S.Ct. 2705, a 5-4 decision, the Supreme Court held that a certificate from a crime lab analyst

16   containing the result of a blood alcohol test, which was introduced through the testimony of a

17   different analyst who did not perform the test, was sufficiently "formalized" to constitute

18   testimonial evidence.  In a concurring opinion, Justice Sotomayor emphasized that the "primary

19   purpose" of the certificate was to create a substitute for trial testimony.  *Id*. at 2722 (Sotomayor,

20   J., concurring).  However, she observed, "We would face a different question if asked to

21   determine the constitutionality of allowing an expert witness to discuss others' testimonial

22   statements if the testimonial statements were not themselves admitted as evidence."  *Id.*

23      In *Williams v. Illinois*, 132 S.Ct. 2221, an expert relied on a lab report creating a DNA

24   profile from semen in a rape victim's vaginal swab to testify that the profile matched defendant's

25   DNA as derived from a current blood sample.  The *Williams* three-judge plurality answered

26   Justice Sotomayor's question by concluding that expert testimony based on an out-of-statement

27   offered solely for the purpose of explaining an assumption on which the expert's opinion rests is

28   not offered for the truth, and thus falls outside the scope of the Confrontation Clause.  *Id*. at 2228.

13

The plurality also found that the outside lab report was not prepared for the primary purpose of accusing a targeted individual.  *Id*. at 2243.  In a concurring opinion, Justice Breyer stated:

> to bar admission of the out-of-court records at issue here could undermine, not fortify, the accuracy of factfinding at a criminal trial.  Such a precedent could bar the admission of other reliable case-specific technical information such as, say, autopsy reports.  Autopsies, like the DNA report in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial.  Autopsies are typically conducted soon after death.  And when, say, a victim's body has decomposed, repetition of the autopsy may not be possible.  What is to happen if the medical examiner dies before trial?  Is the Confrontation Clause effectively to function as a statute of limitations for murder?

*Id*. at 2251 (Breyer, J., concurring, citations and quotations omitted).

In the wake of these fractured opinions, the answer to the question whether autopsy reports and expert testimony based on a report prepared by a different expert should be considered testimonial for purposes of the Confrontation Clause remains opaque.  As several justices candidly acknowledged in *Williams*, "The several different opinions filed today embody several serious, but different, approaches to the difficult general question. Yet none fully deals with the underlying question as to how, after *Crawford*, Confrontation Clause 'testimonial statement' requirements apply to crime laboratory reports."  *Id*. at 2248 (Breyer, J., concurring); *id*. at 2277 (the five justices in the majority "have left significant confusion in their wake. What comes out of four Justices' desire to limit *Melendez-Diaz* and *Bullcoming* in whatever way possible, combined with one Justice's one-justice view of those holdings, is—to be frank—who knows what.") (Kagan, J., dissenting); *see Hensley v. Roden*, 755 F.3d 724, 733-734 (1st Cir. 2014) ("disparity of treatment has reigned" among lower courts following Supreme Court decisions); *United States v. Mallay*, 712 F.3d 79, 95 (2d Cir. 2013) (because "[n]o single rationale of the *Williams* case enjoys the support of a majority of the Justices," the problem is "intractable"); *People v. Dungo*, 55 Cal.4th 608, 618 (2012) ("These widely divergent views [in *Williams*], none of which was able to garner majority support—as reflected in the four-one-four decision—highlight the complexity of the issue."); *id*. at 622 ("The question of what out-of-court statements are and are not testimonial has divided the justices of the United States Supreme Court, whose decisions have not

14

1   yet yielded a clear definition or test.") (Werdegar, J., concurring); *id*. at 628 (lack of majority in

2   *Williams* "makes it difficult to determine what to make of that decision") (Chin, J., concurring).

3        The inescapable conclusion from this confusion is that the Supreme Court has not clearly

4   established a definitive rule that must always be applied by the state courts.  The state court's

5   application of a principle whose "precise contours" are "unclear" cannot be objectively

6   unreasonable.  *White v. Woodall*, 134 S.Ct. 1697, 1705 (2014); *accord Harrington v. Richter*, 131

7   S.Ct. at 786 ("it is not an unreasonable application of clearly established Federal law for a state

8   court to decline to apply a specific legal rule that has not been squarely established by this

9   Court").  Accordingly, habeas relief is unavailable under 28 U.S.C. § 2254(d).

10       Moreover, the state court reasonably concluded that Dr. Hart's testimony regarding the time

11  of death was not testimonial within the meaning of *Crawford*.  Dr. Hart relied on the liver

12  temperature and photos showing lividity in the autopsy report to reach her own independent

13  conclusion about the estimated time of death.  As both the *Williams* plurality and the California

14  Supreme Court in *Dungo* found, expert testimony based on an out-of-court statement that

15  explains the basis for the expert's opinion does not violate the Confrontation Clause.  As for the

16  autopsy report itself, a number of lower courts have found that such reports are not testimonial.

17  *See Hensley v. Roden*, 755 F.3d at 732-735; *United States v. Mallay*, 712 F.3d at 88-102;

18  *McNeiece v. Lattimore*, 501 Fed.Appx. 634, 636 (9th Cir. 2012).  Finally, any error was harmless

19  because the cause of death was not in dispute.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637

20  (1993).

21       Since the state court's determination was neither contrary to, nor an unreasonable

22  application of established Supreme Court precedent, petitioner's claim fails.

23  **III.   NO INSTRUCTIONAL ERROR OCCURRED**

24       Petitioner contends his right to due process was violated when the trial court erroneously

25  sanctioned defense counsel by reading a late discovery jury instruction.  Petn. at 7-12.

26       A claim of state instructional error can be the basis of federal habeas relief only if it "so

27  infected the entire trial that the resulting conviction violates due process."  *Estelle v. McGuire*,

28  502 U.S. 62, 72 (1991).  The test for constitutional error is whether there is a "reasonable

likelihood" the jury misapplied the instructions. *Id*. To make this assessment, the challenged instruction must be evaluated in light of the instructions as a whole and the evidence introduced at trial, *id.*, as well as the arguments of counsel, all of which may clarify the charge to the jury. *Middleton v. McNeil*, 541 U.S. 433, 438 (2004) (per curiam). The federal habeas court must defer to a state court's reasonable application of these principles. *Smith v. Spisak*, 558 U.S. 139 (2010); *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009). If error occurred, the federal habeas court must separately determine whether it had a substantial or injurious effect on the verdict. *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam) (citing *Brecht v. Abrahamson*, 507 U.S. at 637.

The California Court of Appeal assumed for the sake of argument that the late discovery jury instruction should not have been given to the jury, and concluded that any instructional error was harmless error under the state law standard. Specifically, the court held:

III. CALCRIM No. 306

Appellant argues the trial court erred in giving CALCRIM No. 306, regarding the effect of delayed discovery, as a sanction for the late disclosure of the defense expert on crime scene reconstruction. We conclude any error was harmless.

Under the reciprocal discovery provisions of the Penal Code, the defense must disclose to the prosecution the names and addresses of persons it "intends to call as witnesses at trial" and any reports they made. (§ 1054.3, subd. (a).) The phrase "intends to call" means any person the party reasonably anticipates it is likely to call at trial. (*In re Littlefield* (1993) 5 Cal.4th 122, 130.) The disclosure must be made 30 days before trial or, if counsel becomes aware of a witness after that time, immediately. (§ 1054.7.) If disclosure is not timely made as to any particular witness, the trial court may inform the jury of the failure to disclose. (§ 1054.5, subd. (b).)

The witness list filed by the defense did not include its crime scene reconstruction expert, Brent Turvey, and defense counsel did not disclose his name to the prosecution at least 30 days before trial. Counsel provided Turvey's name and curriculum vitae to the prosecutor on April 6, 2011, five days before jury selection began, and identified him as a "possible expert." On the day before the prosecution intended to rest its case, defense counsel provided the prosecutor with a copy of a report prepared by Turvey. The prosecutor asked that Turvey be excluded as a witnesses because the late disclosure made it difficult to adequately prepare.

Defense counsel advised the court she had not determined a crime scene reconstruction expert was necessary until appellant, on the eve of trial, decided to testify and acknowledge his presence at the auto paint shop on the night of the murder. Until that point, the defense strategy had been to challenge the validity of the physical evidence linking appellant to the crime scene. Counsel represented to the court that once appellant decided to testify, it took her almost two weeks to get

16

1

approval from her office to speak to the expert.  Defense counsel said she disclosed
her expert's name as soon as she knew he would be called as a witness, and provided

2

a copy of the expert's report the morning after she received it.

3

The trial court ruled the delay was not justified, and the late disclosure of the report
was a violation of the discovery rules.  It declined to exclude Turvey as a witness, and

4

instead instructed the jury with CALCRIM No. 306:  "Both the People and the
defense must disclose their evidence to the other side before trial, within the time

5

limits set by law.  Failure to follow this rule may deny the other side the chance to
produce all relevant evidence, to counter opposing evidence, or to receive a fair trial.

6

[¶] The attorney for the defense failed to disclose witness Brent Turvey's report
within the legal time period.  [¶] In evaluating the weight and significance of that

7

evidence, you may consider the effect, if any, of that late disclosure.  [¶] However,
the fact that the defendant's attorney failed to disclose evidence within the legal time

8

period is not evidence that the defendant committed a crime."

9

We assume for the sake of argument that the timing of the disclosures by defense
counsel did not violate the discovery statutes, and that CALCRIM No. 306 should not

10

have been given to the jury.  The erroneous giving of CALCRIM No. 306 is analyzed
for prejudice under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836,

11

which requires reversal only when it is reasonably probable the jury would have
reached a result more favorable to the defendant if the instruction had not been given.

12

(*People v. Lawson* (2005) 131 Cal.App.4th 1242, 1249, fn. 7 [*Watson* standard
applied to error in instructing with CALJIC No. 2.28, the predecessor of CALCRIM

13

306]; *see also People v. Cabral* (2004) 121 Cal.App.4th 748, 753.)

14

CALCRIM No. 306 made it clear the jury could only consider the effect of the late
disclosures for the purpose of evaluating Turvey's testimony.  If fully credited, the

15

jury could have inferred from Turvey's testimony that Baldwin allowed her assailant
into the building or was locked in the building with him, and the assailant later

16

attempted to make the crime scene look like a break-in.  But Turvey's testimony did
nothing to identify any particular person other than appellant as the assailant.  The

17

physical evidence linking appellant to the crime was overwhelming, notwithstanding
his claim that he came upon Baldwin's body by happenstance and left blood at the

18

scene after cutting his hand on the office door.  It is not reasonably probable appellant
would have obtained a more favorable result if CALCRIM No. 306 had not been

19

given.

20

Appellant argues that CALCRIM No. 306 is defective, claiming it invites the jury to
speculate about prejudice caused by the late disclosure when there was no evidence

21

regarding its actual effect on the prosecution's case.  He relies on cases criticizing a
former version of CALJIC No. 2.28 concerning late discovery, and argues CALCRIM

22

No. 306 is similarly deficient.  We reject the argument.  (*People v. Riggs* (2008) 44
Cal.4th at 248, 307.)

23

Exh. 3 at 14-16.

24

"[T]he *Watson* harmless error standard is the standard applied by the California state

25

appellate courts in reviewing non-constitutional magnitude, trial type errors."  *Bains v. Cambra*,

26

204 F.3d 964, 971 n. 2 (9th Cir. 2000); *accord Ortiz v. Yates*, 704 F.3d 1026, 1033-1034 & n. 4

27

(9th Cir. 2012).  Accordingly, by finding the instructional error harmless under *Watson* in this

28

1    case, the state court determined that the error did not amount to a federal constitutional violation.

2    The mere fact that the instruction was incorrect under state law is not a basis for federal habeas

3    relief.  *Estelle v. McGuire*, 502 U.S. at 71-72; *Middleton v. McNeil*, 541 U.S. at 437 (no

4    constitutional error where trial court gave one admittedly incorrect instruction and three correct

5    instructions on unreasonable self-defense); *see Fetterly v. Paskett*, 15 F.3d 1472, 1479-1480 (9th

6    Cir. 1994) ("the demonstration of an error under state law does not ipso facto equate to the

7    demonstration of a denial of due process under the Constitution").  A petitioner must show "not

8    merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it

9    violated some [constitutional] right."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

10       The state court's conclusion that no due process violation occurred was reasonable.  Here,

11    the challenged instruction limited jury inferences by directing the jurors to consider the effect, if

12    any, of the late disclosure when evaluating the weight and significance of the evidence.  Exh. 1 at

13    1475-1476.  Also, the instruction did not permit any direct inference leading from the discovery

14    violation to petitioner's guilt, and it advised the jury that it was counsel, not petitioner, who failed

15    to timely disclose the report.  *People v. Riggs*, 44 Cal.4th at 307-308.  In addition, petitioner's

16    guilt was established by his admission that he was in the auto painting shop that night, the

17    inconsistency between the time he claimed to be in the shop and Baldwin's time of death, his

18    DNA extracted from the bloody fingerprint on Baldwin's thigh, his DNA on the blood stains on

19    the floor, the broken glass outside the office, the blood stain in the middle of the garage,

20    Baldwin's blood found in the Buick Elecktra that petitioner admitted he stole on the night of the

21    murder, his lies to the police, and his testimonial inconsistencies and falsehoods before the jury.

22    In light of the strong and largely undisputed evidence of petitioner's guilt and the minor

23    significance of the instruction regarding the discovery violation, there is no reasonable likelihood

24    that the challenged instruction, even if erroneous, affected the outcome or fairness of petitioner's

25    trial.  For the same reasons, any error was harmless under *Brecht*.

26       Since the state court's determination was neither contrary to, nor an unreasonable

27    application of established Supreme Court precedent, petitioner's claim fails.

28

18

IV.   **PETITIONER WAS NOT IMPROPERLY CROSS-EXAMINED ABOUT HIS POST-ARREST SILENCE**

Petitioner contends that his rights were violated when the trial court allowed questions regarding his silence post arrest after he invoked his right to counsel.  Petn., Attachment at 12-17.

The California Court of Appeal disagreed with petitioner's claim.  Specifically, the state court held:

IV. Cross-Examination About Pre-*Miranda* Silence

Appellant contends the judgment must be reversed because the prosecution was permitted, over defense objection, to ask him on cross-examination about his post-arrest, pre-*Miranda* silence after he was taken into custody.  We conclude any such error, assuming it has been preserved for appeal, was harmless beyond a reasonable doubt.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 994 [violations of a defendant's Fifth Amendment rights evaluated under harmless-beyond-a-reasonable-doubt standard of *Chapman*, *supra*, 386 U.S. at p. 24].)

This issue arises in the following context:  Defendant voluntarily spoke to Inspectors Pera and Toomey on November 8, 2006, and denied knowing anything about the murder of Joan Baldwin.  The inspectors returned eight days later on November 16, 2006, with a search warrant requiring appellant to provide a DNA swab.  After he provided the swab, appellant was taken into custody.  During cross-examination, the prosecutor asked appellant whether he then told the inspectors the version of events he had told the jury, and appellant responded, "I believe I'd already asked for an attorney."  Defense counsel objected.  Asked by the prosecutor whether he was told he was being detained for Baldwin's murder, appellant testified that officers from a "separate entity" had handcuffed him, and he was not arrested for the murder until two days later.  The prosecutor asked appellant whether he told those officers the story he had told the jury, and appellant responded, "No.  As I told you earlier, I'd asked for a lawyer."  After this interchange about appellant's request for a lawyer was repeated a couple of times, appellant acknowledged he never spoke to officers in the squad car, on his way to county jail, or at the jail itself.  According to Inspector Pera, appellant did not request an attorney when the DNA swab was taken.

Defense counsel argued that the prosecutor's questions about appellant's failure to tell his story violated *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*), which precludes evidence of a defendant's post-arrest silence following an invocation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  The prosecutor noted that appellant had been picked up by parole officers on November 18, 2006, the day he provided the DNA swab, but was not arrested for the murder until November 21, 2006.  According to the prosecutor, appellant was not given his *Miranda* rights when he was taken into custody on November 18 on the parole violation.  Defense counsel responded that appellant had asked for an attorney, even if he was not read his rights under *Miranda*, and was told he was not entitled to one.  The trial court determined there was no error under *Doyle*.

The rule in *Doyle* is predicated on the notion that a defendant who is explicitly advised of his right to remain silent under *Miranda*, and then exercises that right, has been given an implied assurance by law enforcement that the silence will carry no penalty.  (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 628.)  "Thus, the Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to

19

1

2

3

arrest [citation], or after arrest if no *Miranda* warnings are given, [citation]." (*Brecht*, at p. 628.)  The record before us indicates the prosecutor asked appellant about his silence after he had been taken into custody, but before he had been advised of his rights under *Miranda*.

4

5

6

Appellant argues that apart from *Doyle*, the Fifth Amendment precludes the use of a defendant's post-arrest, pre-*Miranda* silence as impeachment evidence when the defendant has invoked the right to counsel.  Appellant acknowledges that his trial counsel did not object on this ground, but argues the issue has been preserved for appellate review because it is closely related to the claim of *Doyle* error that was raised at trial.

7

8

9

10

11

Even if we assume appellant's current claim has been preserved, no prejudice resulted from the prosecutor's questions about his failure to tell his story when he was taken into custody.  The evidence established that appellant had already spoken to police and denied knowing anything about the Baldwin murder, a version of events that directly contradicted his trial testimony that he had stumbled onto the scene after Baldwin had been killed.  If the prosecution had not questioned appellant about his post-custody silence, the jury would still have been aware he had lied when he originally spoke to the police investigators.

12

13

14

15

16

The evidence of appellant's affirmatively false story was far more incriminating and damaging to his credibility than his silence when taken into custody.  In *People v. Hinton* (2006) 37 Cal.4th 839 at page 868, the court similarly concluded a reference to the defendant's post-arrest silence was harmless where the jury already knew the defendant had given false statements to the police:  "The problem with defendant's trial testimony was not that the jury heard that he once invoked his *Miranda* rights, but that he repeatedly provided in the other interviews untrue accounts of his involvement in the murders."  Any violation of appellant's rights under the Fifth Amendment was harmless beyond a reasonable doubt.

17

Exh. 3 at 16-18.

18

19

Assuming petitioner in fact invoked his right to counsel, that invocation did not equate to an

20

invocation of the right to remain silent.  Those are two separate rights under *Miranda*, and the

21

"implicit assurance" upon which *Doyle* relies is the "right-to-remain silent component of

22

*Miranda*."  *Brecht v. Abrahamson*, 507 U.S. at p. 628.  "Such silence is probative and does not

23

rest on any implied assurance by law enforcement authorities that it will carry no penalty."  *Ibid*.

24

"Thus, the Constitution does not prohibit the use for impeachment purposes of a defendant's

25

silence prior to arrest."  *Ibid*.

26

In *Brecht*, the first time the defendant claimed the shooting was an accident was when he

27

took the stand at trial.  *Brecht v. Abrahamson*, 507 U.S. 619.  "It was entirely proper and

28

probative" for the State to impeach his testimony by pointing out that defendant had failed to tell

anyone before the time he received his *Miranda* warnings about the shooting being an accident.

20

1   *Id.* at 628.  As to petitioner's claim that invocation of the right to counsel is a "per se" invocation

2   of the right to remain silent, the *Brecht* court specifically noted that the "implicit assurance" upon

3   which *Doyle* relies is the "right-to-remain silent component of *Miranda.*"  *Id.* at 628.

4       *Fare v. Michael C.*, 442 U.S. 707 (1979) is not on point.  Petn., Attachment at 17.  In *Fare*,

5   the Supreme Court held that a totality of the circumstances approach should be used to determine

6   whether a juvenile validly waived his *Miranda* rights.  The high court's approach mandated an

7   inquiry into all the circumstances surrounding the interrogation, including the juvenile's age,

8   experience, background, and intelligence.  *Id.* at 725.  Here, petitioner was not a juvenile; he was

9   not given *Miranda* warnings; and he did not invoke his right to remain silent.  Therefore, there

10   was no "per se invocation of all his Fifth Amendment rights under *Miranda.*"

11       Any error in this case was harmless under *Brecht*.  Any rational jury would credit the

12   prosecution's strong case, reject the implausible defense, and find petitioner guilty as charged.

13   The jury was well aware that petitioner changed his story dramatically from a complete denial of

14   any involvement to admission that he was present at the scene of the murder.  His silence upon

15   arrest was inconsequential.

16   **V.    THE TRIAL COURT PROPERLY EXCLUDED IRRELEVANT EVIDENCE OF THE
        VICTIM'S STATE OF MIND**

17

18       Petitioner contends that the trial court erroneously denied his request to present testimony

19   of the victim's statement regarding her state of mind just prior to her death.  Petn., Attachment at

     17-22.

20

21       Federal habeas review does not lie to review a state court's evidentiary ruling, unless it was

22   so prejudicial as to constitute a violation of due process.  *Estelle v. McGuire*, 502 U.S. at 67.

23   "[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value

24   is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or

25   potential to mislead the jury.  Plainly referring to rules of this type, we have stated that the

26   Constitution permits judges to exclude evidence that is repetitive, only marginally relevant or

27   poses an undue risk of harassment, prejudice, or confusion of the issues."  *Holmes v. South

28   Carolina*, 547 U.S. 319, 326-327 (2006) (citations omitted).  A due process violation arises only

21

1     where the excluded evidence had "persuasive assurances of trustworthiness" and was "critical" to

2     the defense.  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

3            The California Court of Appeal rejected petitioner's claim.  Specifically, the court held:

4     V.  Exclusion of Victim's Hearsay Statements Concerning Third Party

5            Appellant argues the trial court erred in excluding evidence that shortly before her
      murder, Baldwin had told her friend Roberta Edlebrock she was uncomfortable
6     staying overnight in the shop where she worked because she was unnerved by the
      shop's manager, Ara Derboghossian.  According to defense counsel's offer of proof,
7     Baldwin had asked to stay with Edelbrock, and had told her Derboghossian was
      "creepy" and would come into the area of the shop where she was sleeping at odd
8     hours.  Defense counsel argued that Baldwin's statements to Edelbrock were
      admissible under the state of mind exception to the hearsay rule (Evid. Code, § 1250),
9     and were relevant to support a third party culpability defense pointing to
      Derboghossian as the actual killer.  Counsel argued that this theory was consistent
10    with her crime scene reconstruction expert's testimony that the scene of the crime
      appeared to have been staged to look like someone had broken in.
11
      To be admissible, evidence of third party culpability must be "direct or circumstantial
12    evidence linking the third person to the actual perpetration" of the crimes for which
      the defendant is being prosecuted.  (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).)
13    Third-party culpability evidence is subject to normal state evidentiary rules, and
      cannot be premised on inadmissible hearsay.  (*Id.* at pp. 834-835; *People v. Frierson*
14    (1991) 53 Cal.3d 730, 746 [" '. . . *Hall* did not undertake to repeal the Evidence Code.
      Incompetent hearsay is as inadmissible as it always was' "]; *see also People v.*
15    *Bradford* (1997) 15 Cal.4th 1229, 1324-1325; *People v. Adams* (2004) 115
      Cal.App.4th 243, 253 (*Adams*).)
16
      Appellant contends Baldwin's statements to Edelbrock were admissible under
17    Evidence Code section 1250, which provides, "(a) Subject to Section 1252
      [conditioning admissibility on the trustworthiness of a statement], evidence of a
18    statement of the declarant's then existing state of mind, emotion, or physical
      sensation . . . is not made inadmissible by the hearsay rule when: [¶] (1) The evidence
19    is offered to prove the declarant's state of mind, emotion, or physical sensation at that
      time or at any other time when it is itself an issue in the action; or [¶] (2) The
20    evidence is offered to prove or explain acts or conduct of the declarant.  [¶] (b) This
      section does not make admissible evidence of a statement of memory or belief to
21    prove the fact remembered or believed."

22    To the extent Baldwin's statements to Edelbrock were offered to prove
      Derbohossian was the killer, they were hearsay and inadmissible unless authorized
23    by a hearsay exception.  (*People v. Noguera* (1992) 4 Cal.4th 599, 622.)  A murder
      victim's hearsay statements describing her fear of the defendant (or, logically, some
24    identified third party) may be admissible under Evidence Code section 1250 when her
      own conduct in conformity with that fear is at issue, or when there is some evidence
25    the defendant (or a third party) was aware of the victim's fear and may have been
      motivated by it in some way.  (*People v. Ricardi* (2012) 54 Cal.4th 758, 816-820
26    (*Ricardi*) [defendant's exploitation of victim's fear relevant to show motive and
      premeditation]; *People v. Waidla* (2000) 22 Cal.4th 690, 725 [victim's fear of
27    defendant relevant to whether she would have consented to defendant's entry into her
      residence in case where burglary special circumstance alleged].)
28

                                          22

1   Baldwin's statements to Edelbrock were not admissible to prove her own state of
    mind or conduct because her state of mind and conduct were not issues in the case.
2   (*People v. Ruiz* (1988) 44 Cal.3d 589, 607-610.) Nor were the statements admissible
    to show Derboghossian had a motive to kill Baldwin, when there was no evidence
3   Derboghossian knew of Baldwin's feelings about him. (*Riccardi*, *supra*, 54 Cal.4th at
    p. 820.) Rather, the statements were statements of memory and belief offered to
4   prove the fact remembered or believed (that Derboghossian was creepy and had come
    into the area where Baldwin was sleeping in the shop), and they were inadmissible
5   under Evidence Code section 1250, subdivision (b).

6   The trial court did not abuse its discretion in excluding the evidence. (*People v.
    McKinnon* (2011) 52 Cal.4th 610, 658 [ruling under Evid. Code, § 1250 reviewed for
7   abuse of discretion]; *People v. Elliott* (2012) 53 Cal.4th 535, 581 [court's ruling on
    admissibility of third party culpability evidence reviewed for abuse of discretion].)
8   The defense theory of third party culpability did not render inadmissible hearsay
    admissible. (*Adams*, *supra*, 115 Cal.App.4th at p. 253.)

9   Exh. 3 at 19-20.

10  In *Holmes v. South Carolina*, 547 U.S. 319 , the Supreme Court held that the exclusion of

11  evidence of third party liability denied due process where the state court's sole rationale for the

12  ruling was that the prosecution's evidence was strong, and the court did not address the probative

13  value of the proffered defense evidence. *Id*. at 329. However, the Supreme Court reaffirmed the

14  states' rights to fashion rules that exclude evidence that is irrelevant, cumulative, or where the

15  probative value is outweighed by the potential to mislead, cause confusion, or create unfair

16  prejudice. *Id*. at 326-327. The Supreme Court expressly approved the states' rights to exclude

17  third party culpability evidence by way of "rules regulating the admission of evidence proffered

18  by criminal defendants to show that someone else committed the crime with which they are

19  charged." *Id*. at 327-328 (citing *People v. Hall*, 41 Cal.3d 826, 833 (1986), which states the

20  California rule that to be admissible third party culpability evidence must be capable of raising a

21  reasonable doubt, and court need not allow "any evidence, however remote," such as evidence of

22  another person's mere motive or opportunity to commit the crime). Thus, the Supreme Court has

23  observed that "[o]nly rarely have we held that the right to present a complete defense was

24  violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*,

25  133 S.Ct. 1990, 1993 (2013) (per curiam).

26  The Ninth Circuit has also affirmed the state courts' application of rules to exclude third

27  party culpability evidence. *Phillips v. Herndon*, 730 F.3d 773, 776-778 (9th Cir. 2013) (state

28

23

1    court reasonably excluded third party confession where witness made three conflicting and

2    contradictory statements); *Christian v. Frank*, 595 F.3d 1076 (2010) (state court reasonably

3    excluded evidence of two unreliable confessions by third party); *Spivey v. Rocha*, 194 F.3d 971,

4    978 (9th Cir. 1999) (in pre-AEDPA case, Ninth Circuit upheld exclusion of gang evidence to

5    suggest that third party might have killed victim, where proffered evidence "does not identify a

6    possible suspect or link any third party to the murder, or establish an actual motive rather than a

7    possible or potential motive"); *Perry v. Rushen*, 713 F.2d 1447, 1451-1455 (9th Cir. 1983).

8    Because this is a general rule, the state courts have broad leeway to apply it.  *Yarborough v.*

9    *Alvarado*, 541 U.S. 652, 664 (2004).

10          As the California appellate court properly found, Joan Baldwin's state of mind was not

11   factually relevant in this case.  Evidence of a murder victim's fear of the alleged killer may be

12   admissible when the victim's state of mind is directly relevant to an element of the offense.  Or,

13   that fear may be in issue when, according to the defendant, the victim has behaved in a manner

14   inconsistent with that fear.  For example, Joan Baldwin's state of mind would have been relevant

15   if petitioner claimed that he acted in a certain way because of what she did.  However, according

16   to the defense, Baldwin was dead before petitioner arrived on the scene.  Therefore, her state of

17   mind was not in issue and was irrelevant.

18          Petitioner's theory of third party culpability did not make Baldwin's state of mind relevant.

19   Also, the fact that Baldwin did not like Ara Derboghossian did not create a causal link between

20   Derboghossian and the crime.  Even if the evidence established that Derboghossian was "creepy"

21   and had a key, that did not establish direct or circumstantial evidence linking Derboghossian to

22   the actual perpetration of the crime in a case where petitioner left his bloody fingerprint on the

23   victim's body and his DNA at the crime scene and admitted he was present on the night of the

24   murder and stole a car.  Derboghossian  did not leave DNA at the scene, a bloody fingerprint on

25   the body, or steal a car while Baldwin lay dead on the floor.  Since the proffered evidence was not

26   relevant, and since the defense theory did not suffice to raise a reasonable doubt as to petitioner's

27   guilt, evidence concerning Baldwin's state of mind was not admissible to show third party

28   culpability.  Finally, even if the jury had heard that Baldwin considered Derboghossian a creepy

                                                    24

1    guy with a key, that testimony would not have placed Derboghossian at the scene or negated

2    evidence that appellant was in the auto shop that night, left his bloody fingerprint on the victim,

3    stole a car from the scene, left Baldwin's blood inside it, and lied to the police at every

4    opportunity.  Thus, any error was harmless under *Brecht*.

5          Since the state court's determination was neither contrary to, nor an unreasonable

6    application of established Supreme Court precedent, petitioner's claim fails.

**CONCLUSION**

8          The petition for writ of habeas corpus should be denied.

9    Dated:  June 8, 2015                          Respectfully Submitted,

10                                                 KAMALA D. HARRIS
                                                   Attorney General of California
11                                                 PEGGY S. RUFFRA
                                                   Supervising Deputy Attorney General
12

13

14                                                 /s/  **Sharon Wooden**
                                                   SHARON WOODEN
15                                                 Deputy Attorney General
                                                   *Attorneys for Respondent*
16   SF2015400912; 20741510.doc

17

18

19

20

21

22

23

24

25

26

27

28

25