UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DWIGHT R. CULTON,

           Petitioner,

     v.

ERIC ARNOLD,

           Respondent.

Case No.  14-cv-05099-JST

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by Petitioner Dwight R. Culton, challenging the validity of his state court sentence.  Respondent has filed an answer to the petition.  Petitioner has not filed a traverse, and the deadline to do so has long since passed.  The Court will deny the petition.

## I.  PROCEDURAL HISTORY

On May 4, 2011, a San Francisco County jury found Petitioner guilty of first-degree murder, Cal. Penal Code § 187(a).  See Answer, Exh. 1 at 1485, 1602[1] (Clerk's Transcript, hereinafter referred to as "CT").  On September 23, 2011, the trial court sentenced Petitioner to twenty-five years to life in state prison.  CT at 1602–04.

Petitioner appealed his conviction in the California Court of Appeal, and on June 27, 2013, the California Court of Appeal affirmed the judgment in a reasoned opinion.  People v. Culton, No. A133390, 2013 WL 3242234 (Cal. Ct. App. June 27, 2013).  On October 2, 2013, the California Supreme Court summarily denied Petitioner's petition for review.  See Answer, Exh. 4.

---

[1] Page number citations to Respondent's exhibits refer to the page number assigned by Respondent on the upper right-hand corner of the exhibits.

On November 19, 2014, Petitioner filed the instant federal petition.  See Docket No. 1.  On March 10, 2015, the Court issued an order to show cause.  See Docket No. 5.

## II.  FACTUAL BACKGROUND

The following factual background is taken from the California Court of Appeal's opinion:[2]

In 1984, [Joan] Baldwin worked at an Earl Scheib auto painting shop on Bryant Street in San Francisco. The manager, Ara Derboghossian, allowed her to stay overnight in the shop in an upstairs room when she was having problems at home, but he did not give her the keys because to do so would put his job at risk. When the doors to the shop were locked at night, there was no way for Baldwin to get out of the building.

On the evening of April 5, 1984, Baldwin returned to the shop from happy hour at about 6:00 p.m. She followed Derboghossian as he locked the front and back sliding doors to the shop from the inside and then left the building through the side door, locking it behind him. Earl Scheib employee Mario Leyva arrived for work at about 7:30 the following morning, April 6, 1984, and noticed the shop's front sliding doors—usually closed and padlocked—were unlocked and wide open. He went inside and saw Baldwin's dead and partially unclothed body lying on the floor of the shop's office. Derboghossian arrived for work and summoned the police.

The officers who responded found the following crime scene: Baldwin's body was lying in a pool of blood and had visible wounds on the face, chest, thigh, and right arm. A cutting of skin and hair from the pubic area (later determined to have been made after her death) was on the floor about two feet from her head, and a bloody fingerprint was visible on her right inner thigh. The walls and furniture of the office were bloody, the office floor safe was open, and the cord of the office telephone had been cut. The window on the office door was broken, and broken glass fragments were on the floor. There was blood on the floor outside the office and a footprint was visible on the concrete. A 1969 Buick was missing from the shop and was recovered a few days later on Valencia Street in San Francisco, with a blood stain on the front seat and a bloody tissue inside. A criminalist collected blood samples from the shop and the Buick and preserved them in the crime lab freezer.

Dr. Jose Ferrer performed an autopsy of Baldwin's body and concluded the cause of death was a stab wound to Baldwin's chest penetrating her heart, consistent with a knife wound. Baldwin had cuts on her face and right forearm (the latter possibly a defensive wound), which could have been caused by a knife or a piece of broken glass. There were abrasions on Baldwin's right and left elbows, left eye, right knee and lower back, and a section of skin and hair in her pubic area had been excised by a post-mortem cutting. Holes in Baldwin's blouse (recovered from the scene) were consistent with the wounds to her chest and arm. There was no evidence of trauma to or semen in her vagina.

Blood samples from the case were submitted to the San Francisco crime lab for DNA analysis in 2006. Appellant's DNA matched a blood stain on Baldwin's thigh, blood stains found on the floor and on broken glass found outside the shop office, a blood stain in the middle of the garage area of the shop, and bloodstains found inside the 1969 Buick that was stolen from the shop and later recovered. The

---

[2] The Court presumes these factual determinations are correct.  28 U.S.C.A. § 2254(e)(1).

2

possibility a random unrelated person would possess the same DNA profile as the blood on Baldwin's left thigh was one in 5.7 quadrillion American Caucasians or African Americans, one in 61 quadrillion California Hispanics, and one in two quadrillion general population Asians.

The fingerprint on Baldwin's thigh had been submitted to the Automated Fingerprint Identification System in 1984 and received candidates other than appellant for possible matches, but none of those candidates actually matched the print. In 2006, the print from Baldwin's thigh was examined by a fingerprint expert with the San Francisco Police Department who was "completely certain" it was appellant's left thumb print.

On November 8, 2006, Inspectors Pera and Toomey of the San Francisco Police Department met with appellant regarding Baldwin's murder. They told appellant he was not under arrest and was free to leave at any time. Appellant acknowledged working as a painter at the Earl Scheib shop on Bryant Street in the early 1980s, and as an assistant manager in 1981 and 1982. He claimed no woman worked at Earl Scheib when he was there, and said he did not know Baldwin or recognize her photo. Told by the inspectors that Baldwin had been murdered in the shop, appellant said he had never heard of the crime. Asked why his DNA might have been found at the shop, appellant said he had fought with a co-worker there. When asked why his DNA was found near Baldwin's body, appellant could not supply an explanation. The inspectors returned several days later with a search warrant to obtain oral swabs from appellant for DNA testing. Appellant protested, but cooperated in giving the sample.

Appellant testified at trial and gave the following explanation of the circumstances linking him to Baldwin's murder: He had been working as an auto body painter at the Earl Scheib shop in San Francisco and eventually became the manager of their shop in Vallejo. On the evening of Baldwin's murder, he was "hustling" on Bryant Street, or "looking for a way to make a buck." Sometime between 7:45 and 8:15 p.m., he noticed the doors of the Earl Scheib shop were open and assumed someone was in there painting cars "off the books" and pocketing the money. Though he no longer worked at that shop, appellant went inside thinking he might be able to make some money. He turned to go into the office when he didn't see anyone in the shop area.

Appellant claimed that as he entered the office, he almost stepped on Baldwin's body and jumped back. He hit the office door with his hand, breaking the glass. He bent down to look at Baldwin and shook her to see if she would respond, but she did not. He walked out of the office "totally confused" with a "thousand thoughts" running through his head, and at some point noticed he was bleeding. Appellant then drove a car away from the shop and left it in a tow-away zone on Valencia Street, near the home of a relative with whom he could talk. His prior convictions included forgery, unarmed bank robbery, five to seven car thefts, and assault with force likely to cause great bodily injury.

The defense presented the testimony of Brent Turvey, who the court determined had "the very minimal qualifications" as an expert in crime scene reconstruction. [FN 2] After reviewing various materials given to him by the defense, Turvey concluded the chain on the front door to the shop had been broken from the inside. Based on this, he opined Baldwin either opened the door herself or the killer was already inside the shop when the doors were locked. Turvey believed the crime scene was staged to make it look like someone had broken in and attacked Baldwin.

FN 2: Turvey is an author of books on criminal investigation and profiling.

3

He is not a doctor, nurse, psychologist, medical examiner, criminalist, or crime scene technician, and his application for membership in the Academy of Forensic Sciences was rejected. Although he claimed to be a sworn peace officer in Alaska, he has never attended a police academy.

Culton, 2013 WL 3242234, at *1–*3.

# III. DISCUSSION

## A. Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts' adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412–13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its

4

United States District Court
Northern District of California

independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied Petitioner's petition for review.  The California Court of Appeal, in its opinion on direct review, addressed all the claims Petitioner raises in the instant petition.  The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991) (state court decision to which 2254(d) applies is the "last reasoned decision" of the state court).[3]

## B.    Petitioner's Claims

Petitioner asserts the following grounds for relief: (1) the trial court erred in denying petitioner's Batson/Wheeler claim;[4] (2) the admission of medical examiner's testimony regarding the victim's autopsy violated his rights under the Confrontation Clause; (3) the trial court committed instructional error; (4) the trial court improperly allowed cross-examination regarding

_____

[3] Although Ylst was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default.  Barker v. Fleming, 423 F.3d 1085, 1091 n.3 (9th Cir. 2005) (citing Lambert v. Blodgett, 393 F.3d 943, 970 n.17 (9th Cir. 2004), and Bailey v. Rae, 339 F.3d 1107, 1112–13 (9th Cir. 2003)).  The look-through rule continues as the Ninth Circuit held that "it is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is 'contrary to' or 'an unreasonable application of' clearly established federal law" and "it [is] unlikely that the Supreme Court intended to disrupt this practice without making its intention clear."  Cannedy v. Adams, 706 F.3d 1148, 1158 (9th Cir.), amended, 733 F.3d 794 (9th Cir. 2013).

[4] In the petition, the header for this claim is: "The trial court erred in denying petitioner's Baston [sic]-Wheeler claim as untimely."  Pet. at 8.  However, while the trial court denied the Batson/Wheeler motion untimely, it also addressed the merits of Petitioner's Batson/Wheeler claim.  Augmented RT at 394.

Petitioner's post-arrest silence; and (5) the trial court erred in denying testimony regarding

victim's state of mind prior to her death.  See Docket No. 1 ("Pet.") at 8–29.[5]

> **1.**   **Batson/Wheeler Claim**

Petitioner argues that the trial court erred in denying his Batson/Wheeler claim.  Pet. at 8–

11.  The state appellate court rejected Petitioner's claim as follows:

> I. Batson/Wheeler
> The prospective jurors who were questioned during voir dire included three African
> Americans. One was seated on the jury, one was excused for cause, and the third, No.
> 2810788, was excused by the prosecutor using a peremptory challenge. Appellant argues
> the peremptory challenge to Juror No. 2810788 was racially motivated, and the trial court
> erred in denying a Batson/Wheeler motion brought by his counsel. We disagree.
>
> A. Relevant Proceedings
> During voir dire, Juror No. 2810788 said he lived in the Presidio, was married with two
> daughters, had worked for Presidio Trust as a carpenter/glazer for the past 10 years, and
> had worked in the Presidio generally for 27 years. Defense counsel asked him, "Being the
> father of young women, would it impact you to know that this is the killing of a woman?"
> The juror indicated it would not, and defense counsel continued, "It wouldn't bring to
> mind your daughters and the possibility that they might be in this situation, at some point?"
> Juror No. 2810788 responded, "I would like to think that I've shown them, to the best that
> I could, that it would be okay." Asked whether he would have "any kind of an emotional
> response to the fact that the victim in this case is a woman," the juror stated, "I don't know
> the person."
>
> Later in the proceedings, the following interchange occurred between the prosecution and
> Juror No. 2810788: "Q: Your turn. Some of the things we were talking about earl[ier] this
> morning. First of all, you or any family members that you know of have any type of
> distasteful or bad experience with police officers? [¶] A: Not that hadn't been worked out
> with the court system. [¶] Q: Tell me about that? [¶] A: As a teenager, I've had some
> altercations. I was born and raised here in San Francisco, so I've lived pretty much
> everywhere in San Francisco, spent three years in [the] Tenderloin District. [¶] Q: Keep
> your voice up. [¶] A: Spent a few years in the Tenderloin District. Seen a lot of things. [¶]
> Q: Uh-huh. [¶] A: But where it involved me, it worked out. [¶] Q: Okay. Do you think—
> well, was this when you were a teenager or as a young adult? [¶] A: Young adult. [¶] Q:
> And have you had any dealings with the court system? [¶] A: As far as ... no. [¶] Q: Any
> type of felony convictions? Any type of arrests or felonies? [¶] A: No. [¶] Q: I'm sorry, I
> didn't hear you. [¶] A: No. [¶] Q: Okay. And in terms of the way you were treated by the
> police—or did you have any interactions with the District Attorney's Office? [¶] A: I think
> at age 19, I had to come here. [¶] Q: And if you—stop you there. If you don't feel
> comfortable talking about this in front of people, I mean, we can—it can be sensitive issues
> [sic ]. We can go back in chambers and talk about it, too. [¶] A: Um, really—I don't think
> it concerns this case. [¶] Q: Okay. [¶] But, I don't have a problem with it. [¶] Q: Okay. I'd
> kind of like to know about it? [¶] A: It was a—I had on my person a martial art weapon,
> and the officer took offense to that. And we ended up going to court, and my lawyer didn't
> show up. [¶] And they held me in contempt, and that's when I had to deal with the District

---
[5] Citations to page numbers in the petition refer to page numbers assigned by the Court's CM/ECF
docketing system, which are located on the upper right hand corner of each page, rather than the
page numbers assigned by Petitioner.

United States District Court
Northern District of California

Attorney. Like I said before, that it seem[ed] to have worked out. [¶] Q: Tell me what happened. [¶] A: The court, the judge, ended up firing my lawyer, holding him in contempt. They let me go on three years' probation for possession of a martial art weapons [sic ] on my person, instead of ... [¶] Q: And that was how long ago? [¶] A: I was 19. So over 20 years ago. [¶] Q: What type of martial arts weapon was it? [¶] A: Various martial art weapons. [¶] Q: More than one? [¶] A: Yes."

The prosecutor asked to approach the bench and the court, at his request, asked Juror No. 2810788 to clarify whether he had been put on felony or misdemeanor probation. The juror said it was misdemeanor probation. The prosecutor then resumed his questioning of Juror No. 2810788: "Q: [S]orry to have to ask you about that. Other than that, did you feel this system treated you fairly? [¶] A: Oh, yeah. [¶] Q: Okay. The fact that you're going to be hearing mainly from police officers here, the fact that you had kind of a bad experience when you were 19, are you going to project that onto—[¶] A: No." The prosecutor then asked some additional questions about Juror No. 2810788's approach to evaluating the credibility of witnesses, his views on the burden of proof beyond a reasonable doubt, and circumstantial evidence. He later used his sixth peremptory challenge to excuse Juror No. 2810788.

Defense counsel did not immediately object to the prosecutor's peremptory challenge of Juror No. 2810788, but brought a Batson/Wheeler motion during an off-the-record chambers conference held after the morning courtroom session at which the challenge was exercised. Voir dire continued, and after the alternate jurors had been selected and sworn, the parties memorialized the chambers conference on the record.

Defense counsel complained the prosecutor had extensively questioned Juror No. 2810788 about his arrest for weapon possession when he was 19 years old, whereas he had not asked similar questions of or excused two Caucasian jurors who had been arrested for marijuana possession and some sort of civil disobedience. Counsel asked the court to conduct a comparative analysis of these other two jurors and appellant, and suggested the differential treatment during questioning was based on appellant's race.

The prosecutor responded that Juror No. 2810788 had mentioned some encounters with the police but said they were not relevant, and he was concerned the weapons charge the juror described might have been a felony (which could mean the juror was ineligible for jury service and had lied to the Jury Commissioner). The prosecutor asked the court to ask the juror whether the conviction was a misdemeanor or a felony because he did not want to alienate the juror in the event he decided to leave him on the panel. As to the other two jurors with a history of police contacts, the prosecutor explained, "Juror number five said that, at one point in time, he got arrested for being in a car, and there was marijuana in the car. And, I mean, a far cry different from having marijuana in a car, in terms of being armed with weapons. [¶] .... then with regards to the last juror, she frankly admitted, and freely admitted, what had happened in terms of her being arrested by the police officers. [¶] Entirely different than being arrested with some type of weapons where she said that she was engaged in civil disobedience on two different occasions."

The trial court indicated it did not believe the Batson/Wheeler motion was timely, as it was made after Juror No. 2810788 had been excused and had left the courtroom. It continued, "[E]ven assuming, for purposes of argument that [the motion] was timely, the fact of his— the fact that the conviction had been for a weapons-related charge, multiple weapons, in a case where there's an allegation of murder that was a murder with a weapon, and the fact that the conviction could have been a felony I think warranted the further examination that the District Attorney did of [Juror No. 2810788] in trying to clarify what these issues were. [¶] And so in comparison related to the other jurors, the fact of the political demonstration of disturbing the peace-related issues ... or the marijuana-related issues ... I can see that those present different kinds of issues. [¶] So in any comparative analysis, I don't see that

there was any problem with the District Attorney's focus on [Juror No. 2810788] going into that inquiry."

The court asked the prosecutor if he had any other comments on his reasons for excusing Juror No. 2810788, and the prosecutor responded, "Well, the other reason is something I think he said yesterday when [defense counsel] indicated that—asked him about the fact that he had two daughters ... that there was a woman who was murdered in this case, that this was a crime of violence against women, and he was very quick to say, 'I don't know that woman. It doesn't have any effect on me.' [¶] I mean, that type of reaction, to me, is kind of a cold reaction. I would think that anybody that has two daughters would have some type of reaction to the fact that, 'Well, yeah, it does concern me, because I have two daughters.' [¶] Just [the] cold, impersonal nature of that answer also concerned me. [¶] You know, if he would have said, 'Well, yeah, I do have some concerns, but I can put it aside.' He didn't even say that. So that was another thing that really concerned me when I thought about it yesterday."

The court found no pattern of exclusion against African American jurors, concluded the challenge to Juror No. 2810788 was not based on his race, and found race neutral reasons for excusing him from jury service on this case. It denied the <u>Batson</u>/<u>Wheeler</u> motion as untimely and on its merits. [FN 3]

> FN 3. On appeal, the People appropriately concede the motion was timely because the in-chambers objection was made before the alternate jurors were selected and sworn, even though the courtroom discussion occurred afterwards. (<u>People v. McDermott</u> (2002) 28 Cal.4th 946, 970.) We consider only the merits of the trial court's ruling.

B. Analysis

As discussed in <u>Batson</u>, <u>supra</u>, 476 U.S. 79 and <u>Wheeler</u>, <u>supra</u>, 22 Cal.3d 258, both the state and federal Constitutions bar peremptory challenges that are based on a juror's race, ethnicity, or membership in a similar cognizable class. (<u>People v. Lenix</u> (2008) 44 Cal.4th 602, 612 (<u>Lenix</u>).) A defendant who suspects a juror has been challenged for a discriminatory reason must bring a motion under <u>Batson</u>/<u>Wheeler</u>, at which point the trial court will analyze the claim using a familiar three-prong test. First, it must determine whether the defendant has made a prima facie showing the prosecutor exercised a peremptory challenge based on race, ethnicity or some other impermissible ground. Second, if the showing is made, the burden then shifts to the prosecutor to demonstrate the challenge was exercised for a neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination by evaluating the proffered reasons and determining whether they are legitimate or pretextual. (<u>Lenix</u>, at p. 612.)

Appellant suggests this is a "first prong" case, and argues the trial court erred in finding no prima facie case of discrimination. The People respond that the court's ruling was in fact based on the second and third prongs of the <u>Batson</u>/<u>Wheeler</u> analysis. We agree with the People because the court made no express finding regarding a prima facie case of discrimination and resolved the issue by referring to the prosecutor's stated reasons for the challenge and defense counsel's comparative analysis of other jurors with a history of arrests. (<u>People v. Lewis</u> (2008) 43 Cal.4th 415, 470–471 [by requesting prosecutor to state reasons for peremptory challenge, court implicitly found prima facie case; in any event, by offering reasons, the prosecutor rendered moot the question of whether a prima facie case existed]; <u>People v. Bonilla</u> (2007) 41 Cal.4th 313, 350 [use of comparative analysis not appropriate when determining whether defendant made first-prong, prima facie showing of discrimination].)

Having concluded this is a second- and third-prong case, we review the trial court's determination that the challenge was not discriminatory for substantial evidence,

presuming the prosecutor used the peremptory challenge in a constitutional manner and "giv[ing] great deference to the trial court's ability to distinguish bona fide reasons from sham excuses." (People v. Burgener (2003) 29 Cal.4th 833, 864 (Burgener).) A reason does not need to be well-founded so long as it is not discriminatory. (Purkett v. Elem (1995) 514 U.S. 765, 768.) "'[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."'" (People v. Stevens (2007) 41 Cal.4th 182, 198.)

Substantial evidence supports the trial court's denial of the Batson/Wheeler motion. The prosecutor explained that he excused Juror No. 2810788 due to concerns about his weapons conviction. A prospective juror's arrest or criminal history or negative experience with law enforcement can serve as a valid basis for a peremptory challenge. (People v. Lomax (2010) 49 Cal.4th 530, 573; People v. Gutierrez (2002) 28 Cal.4th 1083, 1125.)

A comparative analysis of the responses of two seated Caucasian jurors with prior arrests does not alter our conclusion. The first, Juror No. 2945120, was asked about contacts with police officers and explained, "Well, I was arrested when I was 18 for being in a car where they found a small amount of marijuana. So, distasteful experience. Nothing the officer did wrong. I don't think the officer did anything wrong. He was just doing his job." The juror assured the parties nothing about the experience would prevent him from being fair and impartial. Marijuana possession is a nonviolent offense and the prosecutor could reasonably conclude it was not the equivalent of a prior arrest for illegal weapons, especially in a murder case where a weapon, but no drugs, were involved. (See People v. Williams (2006) 40 Cal.4th 287, 311–312 [the marijuana-related arrest of a seated juror's son was not comparable to the extensive criminal history of excused juror's family, which included a rape prosecution resulting in acquittal].)

The second seated juror with a history of police contacts, No. 2665378, had been arrested during a civil disobedience demonstration regarding housing about 10 years earlier and had found the San Francisco police officers she dealt with to be "very courteous and very patient." In 1967, the juror had been convicted of disturbing the peace due to her participation in a protest at the Oakland Induction Center, which consisted of singing Christmas carols. She spent 20 days in jail and described most of the jail guards as "jaded," but found one to be very kind. Finally, Juror No. 2665378 indicated the only bad experience she had ever had with a San Francisco police officer was when the head of the San Francisco Police Officers Association wrote a letter accusing the San Francisco Labor Council (to which she belonged) of being a terrorist organization, an accusation she attributed to political hyperbole. This juror's contacts with law enforcement were a product of her nonviolent political activism, a far different thing than a conviction for possessing multiple illegal weapons.

Appellant suggests a discriminatory intent can be gleaned from the prosecutor's "belated" reliance on appellant's "cold" response ("I don't know the person") when asked whether, as the father of two daughters, he would be affected by the fact the victim in this case was a woman. Appellant suggests this justification was pretextual and notes a seated juror, No. 29255598, simply answered "no" when asked whether he would be concerned about the personal safety of his wife and daughter considering the charged crime involved violence against a woman.

Comparative juror analysis based on the appellate record has inherent limitations. "On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact. 'Even an inflection in the voice can make a difference in the meaning.' " (Lenix, supra, 44 Cal.4th at p. 622.) While we do not have the benefit of being able to compare the demeanors of Juror No. 2810788 and the seated juror who commented

United States District Court
Northern District of California

that he would not be afraid for his wife and daughters, even the bare record suggests a difference in tone. The seated juror simply stated he would not fear for his family's personal safety; the excused juror said he would not have any kind of an emotional response to the case, because he did not know the victim. The first response indicates a lack of fear of appellant, the second suggests emotional indifference to the victim's circumstances.

Because the trial court's denial of the Batson/Wheeler motion on its merits is supported by substantial evidence, appellant is not entitled to reversal of the judgment on this ground. (Burgener, supra, 29 Cal.4th at p. 864.)

Culton, 2013 WL 3242234 at *3–*7.

### a.  Legal Standard

The use of peremptory challenges by either the prosecution or defense to exclude cognizable groups from a jury may violate the Equal Protection Clause.  See Georgia v. McCollum, 505 U.S. 42, 55 (1992).  The Supreme Court first held that the Equal Protection Clause forbids the challenging of potential jurors solely on account of their race, see Batson v. Kentucky, 476 U.S. 79, 89 (1986), and later extended this protection to challenges solely based on gender, see J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 130–43 (1994)).[6] Batson permits prompt rulings on objections to peremptory challenges under a three-step process:

First, the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  Batson, 476 U.S. at 93–94.

Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  Batson, 476 U.S. at 97; Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000).

Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.  Batson, 476 U.S. at 98; Wade, 202 F.3d at 1195.

Because the matter proceeded to the second and third step at the state trial court, this Court need not dwell on the first step of the Batson analysis.  Hernandez v. New York, 500 U.S. 352, 359 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory

---

[6] The California counterpart to Batson is People v. Wheeler, 22 Cal. 3d 258 (1978).

challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

In evaluating the race-neutral explanation, the Court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. See Hernandez, 500 U.S. at 360 (no discriminatory intent where Latino jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish language testimony). It should also keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility. See Rice v. Collins, 546 U.S. 333, 340–41 (2006); Lewis v. Lewis, 321 F.3d 824, 830 (9th Cir. 2003). "[T]he court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools including its own observations and the assistance of counsel." Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004) (citing Lewis, 321 F.3d at 831). A legitimate reason "is not a reason that makes sense, but a reason that does not deny equal protection." Purkett v. Elem, 514 U.S. 765, 769 (1995). What matters is the "*genuineness* of the motive" behind the racially neutral explanation, not "the *reasonableness* of the asserted nonracial motive." Id. "To accept a prosecutor's stated nonracial reasons, the court need not agree with them. The question is not whether the stated reason represents a sound strategic judgment, but 'whether counsel's race-neutral explanation for a peremptory challenge should be believed.'" Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir. 2006) (citing Hernandez, 500 U.S. at 365).

AEDPA "'imposes a highly deferential standard for evaluating state-court rulings'" and "'demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, 562 U.S. 594, 598 (2011) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)). More specifically, the findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, see Purkett, 514 U.S. at 769, as are the findings of the state appellate court, see Mitleider, 391 F.3d at 1050; Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004). Under AEDPA, this means a state court's findings with respect to discriminatory intent are presumed sound unless a petitioner rebuts the presumption by clear and convincing evidence. Miller-El v. Dretke, 545 U.S. 231, 240 (2005). "[The federal court]

must defer to the [state court's] conclusion that there was no discrimination unless that finding 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Cook v. LaMarque, 593 F.3d 810, 816 (9th Cir. 2010) (citing 28 U.S.C. § 2254(d)(2)).  A federal habeas court may grant relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge."  Rice, 546 U.S. at 338.

                    **b.      Analysis**

       The prosecutor's stated reasons for striking Juror No. 2810788 were his arrest for possession of martial arts weapons and his "cold, impersonal" reaction to the prosecution's description of the crime as "a crime of violence against women."  Answer, Exh. 2A ("Augmented RT") at 351, 354–55.  Petitioner argues that the prosecutor's reasons were clearly pretextual because the prosecutor did not question other jurors extensively about their arrests and seated a white juror with an arrest history.

       In reviewing this claim, the Court reviews the state appellate court's finding that there was no discriminatory intent.  In denying Petitioner's Batson/Wheeler claim, the state appellate court conducted a comparative juror analysis,[7] comparing Juror No. 2810788 with Juror Nos. 2945120, 2665378, and 2925598.

       The state appellate court compared Juror No. 2810788 with Juror Nos. 2945120 and 2665378, and noted that the prosecutor could reasonably conclude that marijuana possession, a nonviolent offense, was not the equivalent of weapons possession, and further noted that this was a relevant distinction in a weapons-related murder case that did not involve drugs.  Culton, 2013 WL 3242234 at *6.  The state appellate court also agreed that nonviolent political activism was a qualitatively different kind of police contact than the weapons arrest that Juror No. 2810788 described.  Id.  In comparing Juror No. 2810788 and Juror No. 2925598, who was seated and not

---

[7] The Ninth Circuit has recognized that "comparative juror analysis is an important tool for assessing the state court's factual determinations under § 2254(d)(2)."  See Murray v. Schriro, 745 F.3d 984, 1005 (2014) ("[I]n order for us to discharge our responsibility under AEDPA to review a Batson claim under section 2254(d)(2), we often will have to conduct a formal comparative juror analysis[.]").  Comparative juror analysis involves a comparison between the responses given by the prospective jurors who were struck and those who were not struck, to determine whether the prosecutor's motive was discriminatory in nature.  Miller–El, 545 U.S. at 241.

United States District Court
Northern District of California

African-American, the state appellate court noted that the "bare record suggests a difference in [the] tone [of the answers given by Juror No. 2810788 and Juror No. 2925598]" and further noted that they responded to two different questions.  Id.  The state appellate court noted that the response given by Juror No. 2925598 was a simple statement that he did not fear appellant or fear for his family's personal safety, while the response given by Juror No. 2810788 "suggest[ed] emotional indifference to the victim's circumstances."[8]  Id.

After conducting its comparative analysis, the state appellate court concluded that the trial court's denial of the Batson/Wheeler motion on its merits was supported by substantial evidence. The Court must defer to this conclusion unless that finding was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d)(2).  The Court has reviewed the record and concludes that the record does not support Petitioner's assertion that the prosecutor's challenge was based on unconstitutional considerations.

The record shows that two of the seated jurors, Juror Nos. 2945120 and 2665378, were Caucasian and had arrest histories.  Juror No. 2945120 had been arrested for marijuana possession, and Juror No. 2665378 had been arrested in connection with her nonviolent political activism.

---

[8] The relevant voir dire of Juror No. 2925598 was as follows:
> Q:     Is there anything about the fact that this is a case of violence against a woman that causes you to be concerned about, for instance, [your four-year-old daughter's] personal safety?
> A:     No.
> Q:     Or your wife's?
> A:     No
Augmented RT at 225.

The relevant voir dire of Juror No. 2810788 was as follows:
> Q:     Being the father of [a thirteen-year-old girl and a nine-year-old girl]. would it impact on you to know that this is a killing of a woman?
> A:     (Prospective juror shakes head)
> Q:     It wouldn't bring to mind your daughters and the possibility that they might be in this situation, at some point?
> A:     I would like to think that I've shown them, to the best that I could, that it would be okay.
> Q:     Okay.  So you wouldn't have any kind of emotional response to the fact that the victim in this case is a woman?
> A:     I don't know the person.
Augmented RT at 163–64.

United States District Court
Northern District of California

As to Juror No. 29454120, the prosecutor explained that he did not question him extensively about his marijuana possession because marijuana possession differed from being armed with weapons. Augmented RT at 351. As the state appellate court noted, this was a reasonable distinction since the crime was a murder involving weapons and drugs were not involved. Culton, 2013 WL 3242234 at *6.

The prosecutor further explained that his extended questioning of Juror No. 2810788 was because Juror No. 2810788 was initially not forthcoming about his arrest history. A review of the relevant exchange supports the prosecutor's characterization. When the prosecutor asked whether Juror No. 2810788 had any interactions with the District Attorney's Office, Juror No. 2810788 responded that he had to go there at age 19 but offered no details. Augmented RT at 187. The prosecutor pressed for more details, and Juror No. 2810788 responded that he didn't think his prior history concerned the case. Id. After the prosecutor asked again, Juror No. 2810788 offered some details but concluded with the vague statement "it seem[ed] to have worked out." Id. The prosecutor asked additional questions to elicit what kind of sentence Juror No. 2810788 had received and what weapons were involved. Id. The prosecutor then asked the judge to clarify whether Juror No. 2810788 had received felony or misdemeanor probation, which was relevant as to whether Juror No. 2810788 had been truthful with the Jury Commissioner. Id. at 351. The record does not support Petitioner's assertion that the prosecutor's stated reasons for his levels of questioning of these jurors were pretextual.

As to Juror No. 2665378, the prosecutor explained that he had not needed to question her extensively about her arrest history because she "freely admitted[] what had happened in terms of her being arrested by the police officers." Augmented RT at 352. The record supports the prosecutor's characterization of Juror No. 2665378's voir dire. After being asked by the prosecutor to give a brief description of what issues might affect her ability to serve as a juror, Juror No. 2665378 directed the exchange. She began by describing what credibility she would give a police officer, and then, without prompting, began to list her arrests and explain them in detail. Id. at 326–27. She described the circumstances of the arrest, the timing of the arrest, the focus of the civil disobedience, and her impressions of the police officers with whom she came

1    into contact due to the civil disobedience.  Id.  Juror No. 2665378's detailed and unprompted

2    testimony made it unnecessary for the prosecutor to inquire further.

3           Finally, of the three African-Americans in the venire, one was excused for cause, one was

4    seated, and Juror No. 2810788 was excused via the prosecutor's peremptory challenge.

5    Augmented RT at 353.  The fact that the prosecutor did not strike this African-American juror

6    further undermines Petitioner's purported showing of purposeful discrimination.  See Gonzalez v.

7    Brown, 585 F.3d 1202, 1210 (9th Cir. 2009) (the fact that African-American jurors remained on

8    the panel may be considered indicative of a nondiscriminatory motive) (citing Turner v. Marshall,

9    121 F.3d 1248, 1254 (9th Cir. 1997), overruled on other grounds by Tolbert v. Page, 182 F.3d 677,

10   685 (9th Cir. 1999)).

11          In sum, the state appellate court's finding that there was no discriminatory intent was not

12   based on an unreasonable determination of the facts in light of the evidence presented in the trial

13   court.  Nor has Petitioner come forward with clear and convincing evidence to rebut the

14   presumption that the state court's conclusion was a reasonable one, nor has he otherwise shown

15   why this Court should accept his interpretation of the record over the trial court's credibility

16   determination.  See Miller-El, 545 U.S. at 240.  Accordingly, the Court defers to the state court's

17   conclusion that there was no discriminatory intent.  See Cook, 593 F.3d at 816.  Petitioner is not

18   entitled to habeas relief on this claim.

19          **2.      Confrontation Cause Claim**

20          Petitioner argues that his rights under the Confrontation Clause were violated when the

21   trial court allowed the medical examiner to testify regarding the result of the 1984 autopsy and

22   admitted the autopsy report as a business record.  The state appellate court rejected Petitioner's

23   claim as follows:

24          II. Autopsy Report

25          Appellant argues he was deprived of his constitutional right to confrontation (U.S. Const.,
             6th Amend.) because the court admitted evidence of an autopsy report prepared by a
26          pathologist who did not testify at trial, and allowed a medical examiner called as a
             prosecution witness to offer opinions based on that report. We disagree.
27
             In Crawford v. Washington (2004) 541 U.S. 36, 59 (Crawford), the United States Supreme
28          Court held a defendant's federal constitutional right to confrontation prohibits the use of

"testimonial statements" of a witness who does not appear at trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. Though the [C]ourt did not—and has not—supplied a bright-line rule for what makes a statement testimonial, such statements "have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (People v. Dungo (2012) 55 Cal.4th 608, 619 (Dungo).) The United States Supreme Court has since considered the meaning of "testimonial" as it relates to official reports offered as evidence when the person who prepared the report does not testify at trial. (See Melendez–Diaz v. Massachusetts (2009) 557 U.S. 305, 311 [laboratory's sworn "certificates of analysis" stating that a substance was cocaine was testimonial]; Bullcoming v. New Mexico (2011) 564 U.S. —— [131 S.Ct. 2705] [certified laboratory report regarding alcohol content of blood sample was testimonial]; Williams v. Illinois (2012) 567 U.S. —— [132 S.Ct. 2221] [plurality of the court concluded an expert's testimony regarding a DNA profile by laboratory analyst who did not testify at trial did not violate Confrontation Clause].)

The medical examiner who prepared the autopsy report in this case, Dr. Ferrer, had died by the time of appellant's trial in 2011. Over defense objection, the court allowed prosecution witness and chief medical examiner Dr. Amy Hart to relate the factual findings of the report and to rely on those findings in support of her own opinion regarding the cause and time of Baldwin's death. The court also admitted the report into evidence, finding it to be admissible as a business or official record. (Evid. Code, §§ 1271, 1280.)

It is not necessary in this case to delve into the intricacies of the Confrontation Clause. Apart from the autopsy report, the evidence was overwhelming that Baldwin was attacked, stabbed, and bled to death. The extent of her injuries and cause of her death are not in dispute, and any error relating to that aspect of the evidence would be harmless beyond a reasonable doubt. (People v. Pearson (2013) 56 Cal.4th 393, 463–464; Chapman v. California (1967) 386 U.S. 18, 24 (Chapman).) Appellant's claim of prejudicial error is limited to a fairly narrow aspect of Dr. Hart's testimony—her opinion regarding the time of death.

Based on the liver temperature recorded by Dr. Ferrer in the autopsy report, Dr. Hart estimated the actual time of Baldwin's death as between 7 and 22 hours before the liver temperature was taken. She indicated that lividity (coloration of the body based on the settling of the blood) could sometimes assist in timing a death, but she did not in this case know the conditions or temperature of the area where Baldwin's body was found. Asked by the prosecutor to assume the body was in a cold warehouse on a concrete floor all night, Dr. Hart testified the death could have occurred between 10:00 p.m. and 2:00 a.m., though she acknowledged this range was just an estimate. The 10:00 p.m. to 2:00 a.m. window conflicts with appellant's own testimony that he entered the Earl Scheib shop and found Baldwin already dead between 7:45 p.m. and 8:15 p.m.

Dr. Hart's testimony regarding the time of death was based on the liver temperature recorded in the autopsy report and photographs showing the body's postmortem lividity. In Dungo, supra, 55 Cal.4th at page 619, the California Supreme Court concluded a pathologist's observations in an autopsy report regarding the condition of a victim's body are not testimonial within the meaning of Crawford. Because the only aspect of the report on which the allegedly prejudicial testimony by Dr. Hart was based is not testimonial, her opinion on this point did not violate the Confrontation Clause.

Culton, 2013 WL 3242234 at *7–*8.

### a.  Legal Standard

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  The federal confrontation right applies to the states through the Fourteenth Amendment.  Pointer v. Texas, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36, 61 (2004).  It does not command that evidence be reliable, but rather that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  Id.; see Davis v. Alaska, 415 U.S. 308, 315–16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination).

The Confrontation Clause applies to all "testimonial" statements.  See Crawford, 541 U.S. at 50–51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  Id. at 51 (quoting Webster, An American Dictionary of the English Language (1828)); see id. ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").  The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence.  Crawford, 541 U.S. at 50–51.  For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the violation had an substantial and prejudicial effect upon the jury.  See Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing Brecht, 507 U.S. at 637).

### b.  Analysis

After carefully reviewing the record, the Court concludes that the state appellate court's denial of Petitioner's Confrontation Clause claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.  The United States Supreme Court has not conclusively addressed whether an autopsy report or any of its contents is "testimonial" for purposes of the Confrontation Clause.

17

1    More than five years after <u>Crawford</u> was decided, in <u>Melendez-Diaz v. Massachusetts</u>, 557

2    U.S. 305 (2009), the Supreme Court extended the reasoning in <u>Crawford</u> to sworn "certificates of

3    analysis" which confirmed that the substance seized from the defendant was cocaine.  The

4    <u>Melendez-Diaz</u> court held that the certificates of analysis were testimonial statements because they

5    were prepared for the purpose of establishing or proving some fact at trial, and therefore could not

6    be admitted into evidence absent the testimony of the person who prepared the certificates.

7    <u>Melendez-Diaz</u>, 557 U.S. at 310–11.  Two years later, in <u>Bullcoming v. New Mexico</u>, 131 S. Ct.

8    2705 (2011), the Supreme Court held that a forensic laboratory report containing a testimonial

9    certification regarding a blood alcohol test was a testimonial statement because it was made for the

10   purpose of proving a particular fact and therefore could not be admitted into evidence absent the

11   in-court testimony of the scientist who performed or observed the test reported in the certification.

12   <u>Id.</u> at 2709.  A year later, in <u>Williams v. Illinois</u>, 132 S. Ct. 2221 (2012), a four-justice plurality of

13   the Supreme Court stated that admitting an opinion from a DNA expert based on a report from

14   another laboratory did not violate the Confrontation Clause.  <u>Id.</u> at 2243–44 (plurality op. of Alito,

15   J.). The plurality opinion presented two alternative grounds for its conclusion: (1) the report was

16   not offered for its truth, but rather to explain the basis for the DNA expert's opinion; and (2) even

17   if the report had been offered for its truth, the report was not a testimonial statement because it

18   was "not prepared for the primary purpose of accusing a targeted individual."[9]   <u>Id.</u>

19   Reflecting the lack of guidance from the Supreme Court, federal courts have disagreed as

20   to whether, post <u>Melendez–Diaz</u>, autopsy reports are entitled to the protection of the Confrontation

21   Clause.  <u>See</u> <u>Hensley v. Roden</u>, 755 F.3d 724, 733–34 (1st Cir. 2014) (citing state and federal

22   cases); <u>compare</u> <u>United States v. James</u>, 712 F.3d 79, 97–99 (2d Cir. 2013) (autopsy reports

23   produced by New York City Office of Chief Medical Examiner are not testimonial) <u>with</u> <u>United</u>

24   <u>States v. Ignasiak</u>, 667 F.3d 1217, 1230–33 (11th Cir. 2012) (autopsy reports produced by

25   members of the Florida Medical Examiners Commission are testimonial).  Without the existence

26

27   _____

28   [9] The plurality opinion concluded that the "primary purpose [of the report] was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time."  <u>Williams</u>, 132 S. Ct. at 2243–44.

United States District Court
Northern District of California

18

of clearly established federal law as determined by the United States Supreme Court, the state court's denial of these claims[10] cannot be said to be contrary to, or an unreasonable application of, such law.  See Carey v. Musladin, 549 U.S. 70, 76 (2006) (noting that lower courts' wide divergence in treatment of claim reflected "lack of guidance" from Supreme Court, and "[t]herefore the state court's decision was not contrary to or an unreasonable application of clearly established federal law") (alteration in original) (quoting 28 U.S.C. § 2254(d)(1)); see also Kessee v. Mendoza–Powers, 574 F.3d 675, 677 (9th Cir. 2009) (holding that for purposes of AEDPA review, state-court determination consistent with some federal courts' interpretation of Supreme Court precedent unlikely to be contrary to or involve an unreasonable application of clearly established federal law even if inconsistent with Ninth Circuit view); Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) ("when a Supreme Court decision does not 'squarely address[ ] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in these recent decisions, it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue before us and [] we must defer to the state court decision") (citing Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

Nor was the state appellate court's denial of this claim based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Petitioner's claim of prejudicial error focuses on the victim's time of death.  In her testimony, Dr. Hart relied on the liver temperature, the ambient (room) temperature, and photos in the autopsy report showing lividity to reach her own independent conclusion regarding the victim's estimated time of death.  See Answer, Exh. 2 ("RT") at 938, 958–59.  Under both California and federal law, an expert may base her testimony on matter that "whether or not admissible . . . is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [her] testimony relates," whether or not that testimony is admissible.  Cal. Evid. Code § 801(b); see also

---

[10] The state appellate court did not address whether the autopsy report was a testimonial statement, but rather denied the claim by finding that Dr. Hart's testimony regarding time of death was based on an observation contained within the autopsy report (liver temperature) that was not testimonial, and by finding that any error regarding admission of either the autopsy report or Dr. Hart's testimony was harmless beyond a reasonable doubt.  See Culton, 2013 WL 3242234 at *7–*8.

United States District Court
Northern District of California

Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of . . . . If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."); <u>People v. Gardeley</u>, 14 Cal. 4th 605, 618 (Cal. 1996); <u>United States v. McCollum</u>, 732 F.2d 1419, 1422–23 (9th Cir. 1984).

Even assuming there was an error in admitting the autopsy report or Dr. Hart's testimony, Confrontation Clause claims are subject to harmless error analysis. <u>United States v. Nielsen</u>, 371 F.3d 574, 581 (9th Cir. 2004) (post-Crawford case). Petitioner has failed to show that the admission of either the autopsy report or Dr. Hart's testimony had an actual and prejudicial effect upon the jury. Dr. Hart's testimony was not the sole, or even primary, evidence connecting Petitioner to the murder. DNA evidence found on the victim's body, at the crime scene, and in a car stolen from the shop, <u>see</u> RT at 1021–41, implicated Petitioner, as did Petitioner's admission that he was familiar with the auto shop and was at the crime scene on the night of the murder, <u>see id.</u> at 1212–16. In addition, Dr. Hart acknowledged that the victim's time of death could have occurred as early as 6 p.m. on April 5, 1984, <u>see id.</u> at 955, which was consistent with Petitioner's version of event. The admission of the autopsy report and Dr. Hart's testimony, if it was an error, was harmless. Petitioner is not entitled to habeas relief on this claim.

### 3. Instructional Error

Petitioner argues that the admission of the medical examiner's testimony regarding the victim's autopsy violated his rights under the Confrontation Clause. The state appellate court rejected Petitioner's claim as follows:

III. CALCRIM No. 306

Appellant argues the trial court erred in giving CALCRIM No. 306, regarding the effect of delayed discovery, as a sanction for the late disclosure of the defense expert on crime scene reconstruction. We conclude any error was harmless.

Under the reciprocal discovery provisions of the Penal Code, the defense must disclose to the prosecution the names and addresses of persons it "intends to call as witnesses at trial" and any reports they made. (§ 1054.3, subd. (a).) The phrase "intends to call" means any person the party reasonably anticipates it is likely to call at trial. (<u>In re Littlefield</u> (1993) 5 Cal.4th 122, 130.) The disclosure must be made 30 days before trial or, if counsel becomes aware of a witness after that time, immediately. (§ 1054.7.) If disclosure is not timely made as to any particular witness, the trial court may inform the jury of the failure to disclose. (§

1054.5, subd. (b).)

The witness list filed by the defense did not include its crime scene reconstruction expert, Brent Turvey, and defense counsel did not disclose his name to the prosecution at least 30 days before trial. Counsel provided Turvey's name and curriculum vitae to the prosecutor on April 6, 2011, five days before jury selection began, and identified him as a "possible expert." On the day before the prosecution intended to rest its case, defense counsel provided the prosecutor with a copy of a report prepared by Turvey. The prosecutor asked that Turvey be excluded as a witness[] because the late disclosure made it difficult to adequately prepare.

Defense counsel advised the court she had not determined a crime scene reconstruction expert was necessary until appellant, on the eve of trial, decided to testify and acknowledge his presence at the auto paint shop on the night of the murder. [FN 4] Until that point, the defense strategy had been to challenge the validity of the physical evidence linking appellant to the crime scene. Counsel represented to the court that once appellant decided to testify, it took her almost two weeks to get approval from her office to speak to the expert. Defense counsel said she disclosed her expert's name as soon as she knew he would be called as a witness, and provided a copy of the expert's report the morning after she received it.

> FN 4: Counsel made this disclosure during an in camera hearing, the transcript of which has been unsealed at appellant's request.

The trial court ruled the delay was not justified, and the late disclosure of the report was a violation of the discovery rules. It declined to exclude Turvey as a witness, and instead instructed the jury with CALCRIM No. 306: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] The attorney for the defense failed to disclose witness Brent Turvey's report within the legal time period. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure. [¶] However, the fact that the defendant's attorney failed to disclose evidence within the legal time period is not evidence that the defendant committed a crime."

We assume for the sake of argument that the timing of the disclosures by defense counsel did not violate the discovery statutes, and that CALCRIM No. 306 should not have been given to the jury. The erroneous giving of CALCRIM No. 306 is analyzed for prejudice under the standard of People v. Watson (1956) 46 Cal.2d 818, 836, which requires reversal only when it is reasonably probable the jury would have reached a result more favorable to the defendant if the instruction had not been given. (People v. Lawson (2005) 131 Cal.App.4th 1242, 1249, fn. 7 [Watson standard applied to error in instructing with CALJIC No. 2.28, the predecessor of CALCRIM 306]; see also People v. Cabral (2004) 121 Cal.App.4th 748, 753.)

CALCRIM No. 306 made it clear the jury could only consider the effect of the late disclosures for the purpose of evaluating Turvey's testimony. If fully credited, the jury could have inferred from Turvey's testimony that Baldwin allowed her assailant into the building or was locked in the building with him, and the assailant later attempted to make the crime scene look like a break-in. But Turvey's testimony did nothing to identify any particular person other than appellant as the assailant. The physical evidence linking appellant to the crime was overwhelming, notwithstanding his claim that he came upon Baldwin's body by happenstance and left blood at the scene after cutting his hand on the office door. It is not reasonably probable appellant would have obtained a more favorable result if CALCRIM No. 306 had not been given.

1

2

3

4

> Appellant argues that CALCRIM No. 306 is defective, claiming it invites the jury to speculate about prejudice caused by the late disclosure when there was no evidence regarding its actual effect on the prosecution's case. He relies on cases criticizing a former version of CALJIC No. 2.28 concerning late discovery, and argues CALCRIM No. 306 is similarly deficient. We reject the argument. (People v. Riggs (2008) 44 Cal.4th at 248, 307.)

5   Culton, 2013 WL 3242234 at  *8–*9.

6          **a.**      **Legal Standard**

7          The Due Process Clause of the Fourteenth Amendment protects the accused against

8   conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

9   crime with which he or she is charged.  In re Winship, 397 U.S. 358, 364 (1970).  A jury

10   instruction violates due process if it fails to give effect to the requirement that the state must prove

11   every element of the offense beyond a reasonable doubt.  See Middleton v. McNeil, 541 U.S. 433,

12   437 (2004).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show

13   that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates

14   due process.'"  See Estelle v. McGuire, 502 U.S. 62, 72 (1991) (citing Cupp v. Naughten, 414

15   U.S. 141, 147 (1973)); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("it must be

16   established not merely that the instruction is undesirable, erroneous or even 'universally

17   condemned,' but that it violated some [constitutional right]") (quoting Cupp, 414 U.S. at 146).

18   The instruction may not be judged in artificial isolation, but must be considered in the context of

19   the instructions as a whole and the trial record.  See Estelle, 502 U.S. at 72.  In other words, the

20   court must evaluate jury instructions in the context of the overall charge to the jury as a

21   component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing

22   Henderson v. Kibbe, 431 U.S. 145, 154 (1977)).

23          **b.**      **Analysis**

24          Since the state court only referenced state law in rejecting this claim, Culton, 2013 WL

25   3242234 at *8–*9, the Court follows the Supreme Court's direction and "determine[s] what

26   arguments or theories . . . could have supported" the state court's rejection of the federal claim,

27   and then gives deference to those arguments or theories under AEDPA.  Harrington, 562 U.S. at

28   102.

1   After a careful review of the record and the relevant case law, the Court concludes that the

2   Petitioner's right to due process was not violated by the trial court's giving of CALCRIM jury

3   instruction No. 306.  Although a criminal defendant has a right to present witnesses in his own

4   defense, he must "comply with established rules of procedure and evidence designed to assure

5   both fairness and reliability in the ascertainment of guilt and innocence."  Chambers v.

6   Mississippi, 410 U.S. 284, 302 (1973); see also Michigan v. Lucas, 500 U.S. 145, 149–51 (1991)

7   ("probative evidence may, in certain circumstances, be precluded when a criminal defendant fails

8   to comply with a valid discovery rule").  Nothing in the record undercuts the trial court's finding

9   that the defense committed a discovery violation (see RT at 1058–68, 1463–71 and 1646–48), and

10  Petitioner has not met his burden of rebutting this factual finding by clear and convincing

11  evidence, as required by 28 U.S.C. § 2254(e)(1).  Given this discovery violation, the trial court

12  reasonably struck the appropriate balance of allowing the defense to present the belatedly

13  discovered evidence to support its theory, yet advising the jury that the late disclosure prevented

14  the prosecution from conducting an investigation.  Moreover, nothing in CALCRIM No. 306

15  suggested that Petitioner was to blame for the late disclosure.  Rather, the instruction explicitly

16  stated that the late disclosure was made by Petitioner's attorney and that the late disclosure "is not

17  evidence that [Petitioner] committed a crime."  RT at 1491.

18  Further, assuming arguendo that the trial court erred in giving CALCRIM No. 306, any

19  error was harmless because it did not have a substantial and injurious effect or influence in

20  determining the jury's verdict.  See Brecht, 507 U.S. at 637–38.   As the state appellate court

21  noted, while Turvey's testimony challenged the prosecution's version of how the assailant entered

22  the building, it did not identify any particular person other than Petitioner as the assailant.

23  According to Turvey, either Baldwin let the assailant in (which is inconsistent with testimony that

24  Baldwin had no way of exiting the auto shop once locked in), or the assailant was hiding in the

25  auto shop prior to the shop being locked up.  See RT at 1372.  Neither possibility is inconsistent

26  with concluding that Petitioner was the assailant.  In addition, there was significant evidence

27  linking Petitioner to the crime, including Petitioner's admission that he was in the auto shop that

28  night; Petitioner's admission that he was familiar with the layout of the auto shop because he had

United States District Court
Northern District of California

previously worked there; and Petitioner's DNA matching the bloody fingerprint on the victim's thigh, the blood stains on the floor, the blood stains on the broken glass outside the office, the blood stain in the middle of the garage, and the blood found in the car stolen from the shop.  Given that Turvey's testimony did not strongly support Petitioner's version of events, the giving of CALCRIM No. 306 did not have a substantial or injurious effect or influence in determining the jury's verdict.  This habeas claim is denied.

### 4.   Cross-Examination About Pre-<u>Miranda</u> Silence

Petitioner argues that the trial court erred in allowing the prosecution to cross-examine him regarding his post-arrest, pre-<u>Miranda</u> silence.  The state appellate court rejected Petitioner's claim as follows:

IV. Cross–Examination About Pre–<u>Miranda</u> Silence

Appellant contends the judgment must be reversed because the prosecution was permitted, over defense objection, to ask him on cross-examination about his post-arrest, pre-<u>Miranda</u> silence after he was taken into custody. We conclude any such error, assuming it has been preserved for appeal, was harmless beyond a reasonable doubt. (<u>People v. Cunningham</u> (2001) 25 Cal.4th 926, 994 [violations of a defendant's Fifth Amendment rights evaluated under harmless-beyond-a-reasonable-doubt standard of <u>Chapman</u>, <u>supra</u>, 386 U.S. at p. 24].)

This issue arises in the following context: Defendant voluntarily spoke to Inspectors Pera and Toomey on November 8, 2006, and denied knowing anything about the murder of Joan Baldwin. The inspectors returned eight days later on November 16, 2006, with a search warrant requiring appellant to provide a DNA swab. After he provided the swab, appellant was taken into custody. During cross-examination, the prosecutor asked appellant whether he then told the inspectors the version of events he had told the jury, and appellant responded, "I believe I'd already asked for an attorney." Defense counsel objected. Asked by the prosecutor whether he was told he was being detained for Baldwin's murder, appellant testified that officers from a "separate entity" had handcuffed him, and he was not arrested for the murder until two days later. The prosecutor asked appellant whether he told those officers the story he had told the jury, and appellant responded, "No. As I told you earlier, I'd asked for a lawyer." After this interchange about appellant's request for a lawyer was repeated a couple of times, appellant acknowledged he never spoke to officers in the squad car, on his way to county jail, or at the jail itself. According to Inspector Pera, appellant did not request an attorney when the DNA swab was taken.

Defense counsel argued that the prosecutor's questions about appellant's failure to tell his story violated <u>Doyle v. Ohio</u> (1976) 426 U.S. 610 (<u>Doyle</u>), which precludes evidence of a defendant's post-arrest silence following an invocation of his rights under <u>Miranda v. Arizona</u> (1966) 384 U.S. 436 (<u>Miranda</u>). The prosecutor noted that appellant had been picked up by parole officers on November 18, 2006, the day he provided the DNA swab, but was not arrested for the murder until November 21, 2006. According to the prosecutor, appellant was not given his <u>Miranda</u> rights when he was taken into custody on November 18 on the parole violation. Defense counsel responded that appellant had asked for an

attorney, even if he was not read his rights under <u>Miranda</u>, and was told he was not entitled to one. The trial court determined there was no error under <u>Doyle</u>.

The rule in <u>Doyle</u> is predicated on the notion that a defendant who is explicitly advised of his right to remain silent under <u>Miranda</u>, and then exercises that right, has been given an implied assurance by law enforcement that the silence will carry no penalty. (<u>Brecht v. Abrahamson</u> (1993) 507 U.S. 619, 628.) "Thus, the Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to arrest [citation], or after arrest if no <u>Miranda</u> warnings are given, [citation]." (<u>Brecht</u>, at p. 628.) The record before us indicates the prosecutor asked appellant about his silence after he had been taken into custody, but before he had been advised of his rights under <u>Miranda</u>.

Appellant argues that apart from <u>Doyle</u>, the Fifth Amendment precludes the use of a defendant's post-arrest, pre-<u>Miranda</u> silence as impeachment evidence when the defendant has invoked the right to counsel. Appellant acknowledges that his trial counsel did not object on this ground, but argues the issue has been preserved for appellate review because it is closely related to the claim of Doyle error that was raised at trial.

Even if we assume appellant's current claim has been preserved, no prejudice resulted from the prosecutor's questions about his failure to tell his story when he was taken into custody. The evidence established that appellant had already spoken to police and denied knowing anything about the Baldwin murder, a version of events that directly contradicted his trial testimony that he had stumbled onto the scene after Baldwin had been killed. If the prosecution had not questioned appellant about his post-custody silence, the jury would still have been aware he had lied when he originally spoke to the police investigators.

The evidence of appellant's affirmatively false story was far more incriminating and damaging to his credibility than his silence when taken into custody. In <u>People v. Hinton</u> (2006) 37 Cal.4th 839 at page 868, the court similarly concluded a reference to the defendant's post-arrest silence was harmless where the jury already knew the defendant had given false statements to the police: "The problem with defendant's trial testimony was not that the jury heard that he once invoked his <u>Miranda</u> rights, but that he repeatedly provided in the other interviews untrue accounts of his involvement in the murders." Any violation of appellant's rights under the Fifth Amendment was harmless beyond a reasonable doubt.

<u>Culton</u>, 2013 WL 3242234 at  *9–*10.

### a.     Legal Standard

Due process requires that a defendant be able to exercise his "constitutional right to remain silent and not be penalized at trial for doing so." <u>United States v. Negrete-Gonzales</u>, 966 F.2d 1277, 1280–81 (9th Cir. 1992).  To protect the right to remain silent, a defendant's silence "at the time of arrest and after receiving Miranda warnings" cannot be used to impeach him should he choose to testify at trial.  <u>Doyle v. Ohio</u>, 426 U.S. 610, 619 (1976).

When <u>Doyle</u> has been violated, a petitioner is not entitled to habeas relief "unless the error 'had substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Hurd v. Terhune</u>, 619 F.3d 1080, 1089–90 (9th Cir. 2010) (quoting <u>Brecht</u>, 507 U.S. at 622, 637–38).  In

United States District Court
Northern District of California

evaluating whether <u>Doyle</u> error was harmless, the habeas court "attempts to determine not 'whether the jury would have decided the same way even in the absence of the error,' but 'whether the error influenced the jury.'" <u>Hurd</u>, 619 F.3d at 1090 (citing <u>Arnold v. Runnels</u>, 421 F.3d 859, 869 (9th Cir. 2005). In doing so, the court considers (1) the extent of the comments, (2) whether an inference of guilt from silence was stressed to the jury, and (3) the extent of other evidence suggesting the defendant's guilt. <u>Id</u>. A federal habeas court applies the harmless-error standard enumerated in <u>Brecht</u> without regard for the state court's harmlessness determination. <u>Merolillo v. Yates</u>, 663 F.3d 444, 455 (9th Cir. 2011).

### b.    Analysis

As a preliminary matter, it is not clear that Petitioner makes out a claim for <u>Doyle</u> error, which protects a defendant's post-arrest, post-<u>Miranda</u> silence. Defense counsel acknowledged that Petitioner had not been advised of his rights pursuant to <u>Miranda</u>, but argued that Petitioner had invoked his constitutional rights when he requested an attorney. <u>See</u> RT at 1348. The record is unclear as to whether Petitioner requested an attorney. The prosecutor claimed that four police officers and two parole officers would testify that Petitioner had not invoked his right to counsel around the time of the arrest, <u>see id.</u> at 1284, while defense counsel claimed that a federal parole agent would testify that Petitioner asked for an attorney and was told that he could not have one, <u>see id.</u> 1348–49.

Even assuming that the facts give rise to a <u>Doyle</u> claim, however, Petitioner has failed to demonstrate that the introduction of the evidence had a substantial and injurious effect on the jury's verdict. As the state court noted, evidence of Petitioner's affirmatively false story to police officials was more incriminating and damaging to his credibility than his silence when he was taken into custody. Petitioner acknowledged that when he was interviewed by Inspectors Pera and Toomey on November 8, 2006, he falsely claimed that he did not know anything about the murder, that this was the first time he had heard of the murder, that he did not know Baldwin, and that he did not recognize her body at the crime scene. <u>See</u> RT 1223–25, 1227. He also acknowledged that during that interview, he suggested that his DNA was found at the scene because he once worked there and had fought with a coworker on the premises. <u>See id.</u> at 1225.

26

Petitioner acknowledged that he did not tell police inspectors the version of events that he presented at trial.  RT 1227, 1234–36.  Petitioner's habeas claim for relief based on the use of his post-arrest silence is denied.

### 5.    Exclusion of Certain of Victim's Statements Prior to Death

Petitioner argues that the trial court erred in excluding evidence of certain statements made by the victim to her friend, Roberta Edlebrock, prior to her death.  The state appellate court rejected Petitioner's claim as follows:

V. Exclusion of Victim's Hearsay Statements Concerning Third Party

Appellant argues the trial court erred in excluding evidence that shortly before her murder, Baldwin had told her friend Roberta Edlebrock she was uncomfortable staying overnight in the shop where she worked because she was unnerved by the shop's manager, Ara Derboghossian. According to defense counsel's offer of proof, Baldwin had asked to stay with Edelbrock, and had told her Derboghossian was "creepy" and would come into the area of the shop where she was sleeping at odd hours. Defense counsel argued that Baldwin's statements to Edelbrock were admissible under the state of mind exception to the hearsay rule (Evid. Code, § 1250), and were relevant to support a third party culpability defense pointing to Derboghossian as the actual killer. Counsel argued that this theory was consistent with her crime scene reconstruction expert's testimony that the scene of the crime appeared to have been staged to look like someone had broken in.

To be admissible, evidence of third party culpability must be "direct or circumstantial evidence linking the third person to the actual perpetration" of the crimes for which the defendant is being prosecuted. (People v. Hall (1986) 41 Cal.3d 826, 833 (Hall).) Third-party culpability evidence is subject to normal state evidentiary rules, and cannot be premised on inadmissible hearsay. (Id. at pp. 834–835; People v. Frierson (1991) 53 Cal.3d 730, 746 ["'... Hall did not undertake to repeal the Evidence Code. Incompetent hearsay is as inadmissible as it always was'"]; see also People v. Bradford (1997) 15 Cal.4th 1229, 1324–1325; People v. Adams (2004) 115 Cal.App.4th 243, 253 (Adams).)

Appellant contends Baldwin's statements to Edelbrock were admissible under Evidence Code section 1250, which provides, "(a) Subject to Section 1252 [conditioning admissibility on the trustworthiness of a statement], evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation ... is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant. [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

To the extent Baldwin's statements to Edelbrock were offered to prove Derboghossian was the killer, they were hearsay and inadmissible unless authorized by a hearsay exception. (People v. Noguera (1992) 4 Cal.4th 599, 622.) A murder victim's hearsay statements describing her fear of the defendant (or, logically, some identified third party) may be admissible under Evidence Code section 1250 when her own conduct in conformity with that fear is at issue, or when there is some evidence the defendant (or a third party) was aware of the victim's fear and may have been motivated by it in some way. (People v. Ricardi (2012) 54 Cal.4th 758, 816–820 (Ricardi) [defendant's exploitation of victim's fear

relevant to show motive and premeditation]; <u>People v. Waidla</u> (2000) 22 Cal.4th 690, 725 [victim's fear of defendant relevant to whether she would have consented to defendant's entry into her residence in case where burglary special circumstance alleged].)

Baldwin's statements to Edelbrock were not admissible to prove her own state of mind or conduct because her state of mind and conduct were not issues in the case. (<u>People v. Ruiz</u> (1988) 44 Cal.3d 589, 607–610.) Nor were the statements admissible to show Derboghossian had a motive to kill Baldwin, when there was no evidence Derboghossian knew of Baldwin's feelings about him. (<u>Riccardi</u>, <u>supra</u>, 54 Cal.4th at p. 820.) Rather, the statements were statements of memory and belief offered to prove the fact remembered or believed (that Derboghossian was creepy and had come into the area where Baldwin was sleeping in the shop), and they were inadmissible under Evidence Code section 1250, subdivision (b).

The trial court did not abuse its discretion in excluding the evidence. (<u>People v. McKinnon</u> (2011) 52 Cal.4th 610, 658 [ruling under Evid. Code, § 1250 reviewed for abuse of discretion]; <u>People v. Elliott</u> (2012) 53 Cal.4th 535, 581 [court's ruling on admissibility of third party culpability evidence reviewed for abuse of discretion].) The defense theory of third party culpability did not render inadmissible hearsay admissible. (<u>Adams</u>, <u>supra</u>, 115 Cal.App.4th at p. 253.)

<u>Culton</u>, 2013 WL 3242234 at *10–*11.

### a.    Legal Standard

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense" and the right to present relevant evidence in their own defense.  <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324 (2006) (quoting <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986)).  This right is not unlimited, but rather is subject to reasonable restrictions.  <u>United States v. Scheffer</u>, 523 U.S. 303, 308 (1998); <u>Taylor v. Illinois</u>, 484 U.S. 400, 410 (1988) (accused does not have an "unfettered right" to present any evidence he wishes).  A state evidentiary rule excluding evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary" or "disproportionate to the purposes they are designed to serve"; and "infringe[s] upon a weighty interest of the accused." <u>Scheffer</u>, 523 U.S. at 308 (internal quotation marks and citations omitted).

To the extent that Petitioner is arguing that the exclusion of Baldwin's statements to Edelbrock violated state law, e.g. that the statements were admissible under section 1250 of the California Evidence Code, habeas relief is unavailable.  <u>Estelle</u>, 502 U.S. at 67 (federal habeas corpus relief does not lie for errors of state law); <u>see also</u> <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (finding federal habeas relief "unavailable for alleged error in the interpretation or

United States District Court
Northern District of California

1    application of state law").  A state court's evidentiary ruling is grounds for federal habeas relief

2    only if the ruling renders the state proceedings so fundamentally unfair as to violate due process.

3    See Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir. 1990) ("The state court's decision to exclude

4    certain evidence must be so prejudicial as to jeopardize the defendant's due process rights."); see

5    also Reiger v. Christensen, 789 F.2d 1425, 1430 (9th Cir. 1986).  "A habeas petitioner bears a

6    heavy burden in showing a due process violation based on an evidentiary decision."  Boyde v.

7    Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).

8         Evidence of potential third-party culpability must be admitted when, under the "facts and

9    circumstances" of the individual case, its exclusion would deprive the defendant of a fair trial.

10   Chambers, 410 U.S. at 303 (exclusion of evidence of third-party confession violated due process

11   where the excluded evidence was highly corroborated and the testimony was crucial to the

12   defense); Lunbery v. Hornbeak, 605 F.3d 754, 761 (9th Cir. 2010) (exclusion of statement by third

13   party that he had killed defendant's husband deprived defendant of the right to present a defense

14   because the "excluded testimony . . . bore substantial guarantees of trustworthiness and was

15   critical to [defendant's] defense").  The Supreme Court has noted that "rules regulating the

16   admission of evidence proffered by criminal defendants to show that someone else committed the

17   crime with which they are charged . . . are widely accepted[.]"  Holmes, 547 U.S. at 327.

18   Moreover, the Ninth Circuit has determined that where the proffered evidence of third-party

19   culpability simply affords a possible ground of suspicion pointing to a third party and does not

20   directly connect that person with the actual commission of the offense, that evidence may be

21   excluded.  People of Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir. 1993) (citing Perry

22   v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983)).

23              **b.      Analysis**

24         Petitioner fails to establish that the exclusion of Baldwin's statements to Edelbrock

25   violated due process.  In general, the Supreme Court has required the admission of evidence of

26   potential third-party culpability where the evidence shows that someone else committed the crime.

27   For example, in Chambers, the Supreme Court found that the trial court improperly excluded

28   testimony from three persons who each would have testified to hearing confessions made by

United States District Court
Northern District of California

29

McDonald that he, not Chambers, had shot the victim.  <u>Chambers</u>, 410 U.S. at 292–94 and 302–03.  Here, Baldwin's hearsay statements do not directly link Derboghossian to Baldwin's murder.  At best, Baldwin's statements that she was unnerved by Derboghossian and that he came into her sleeping area at odd hours indicate that he had access to Baldwin's sleeping area, which had already been established by Derboghossian's testimony, <u>see</u> RT at 582–83.  Any inference that he was culpable of Baldwin's murder would be purely speculative.  Baldwin's statements do not place Derboghossian at the auto shop at the time of her murder, nor do they establish a motive.

Neither the California rule of evidence requiring sufficient evidence linking the third person to the crime, nor its application by the trial court in this case, constitutes a due process violation.  Therefore, the appellate court's decision did not involve an unreasonable application of clearly established federal law.

Moreover, even assuming arguendo that Petitioner's constitutional rights were violated by the exclusion of Edelbrock's statement, habeas relief is not warranted because the exclusion of such evidence did not have a substantial and injurious effect upon the verdict.  As discussed <u>infra</u> in Section III.B.2.b, there was substantial evidence of Petitioner's guilt, including his admission that he was present at the crime scene and his DNA matching the blood stains found on Baldwin's thigh, on the floor of the auto shop, on broken glass found outside the auto shop office, in the middle of the garage area of the shop, and inside the 1969 Buick that was stolen from the shop and later recovered.  Accordingly, Petitioner is not entitled to relief on this claim.

## C.   Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  <u>See</u> Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  <u>Id.</u> § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

### III. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

Dated:  May 31, 2016

_____
JON S. TIGAR
United States District Judge